THE STATE v. C. F. JONES.

*Homicide—Evidence—Judge's Charge.*

Where the testimony established a strong chain of circumstances, going to show that the prisoner had killed his wife by choking and then throwing her into a river, and there were appearances of a struggle on the bank near where the body was found; *Held,* that it was not error to instruct the jury that, if the fact of killing was duly established, the crime was murder or nothing.

(*State* v. *Rash,* 12 Ired., 382; *State* v. *Haywood,* Phil., 376, and *State* v. *Smith,* 77 N. C., 488, cited).

The defendant was tried upon an INDICTMENT for the murder of Tempy S. Jones, his wife, before *Shipp, Judge,* at the Spring Term, 1887, of the Superior Court of CRAVEN.

The mother of the deceased testified, that on the day before the alleged murder the defendant came to her house, where his wife was staying, about dusk; that he and his wife seemed very affectionate toward each other; that defendant stated that he came to take his wife across Neuse river to Mr. Kirkman's, where he was working; that he and deceased left the house on the next morning, Sunday, May the 1st, about 9 o'clock, and went in the direction of the river; that she saw the body of the deceased on Tuesday, the 3rd of May, after it had been taken from the river, and that there were marks of finger-nails on the throat. She further testified, that some time before the death of the deceased the defendant asked her for a divorce, and, upon her refusing, the defendant said he would have one anyhow; that defendant lived with his wife till October, 1886, when he went off and left her at witness' house; that he furnished her no support after that, and did not visit her till about two weeks before her death; and that she found a piece of cloth

in Pierce Ransom's boat, which deceased had carried from her house when she left on Sunday.

The father of the deceased testified substantially to the same facts, with the addition, that on the night before the alleged killing the defendant seemed restless; * * * that he had heard the deceased say in the presence of the defendant, several months before the killing, that the defendant had struck her and would have killed her if she had not prevented it.

Pierce Ransom testified that he saw the deceased and the defendant, with a child in his arms, going towards Neuse river on Sunday morning, about 11 o'clock; the defendant had a stick under his arm; the deceased was lagging behind, carrying a bag of clothes; she looked troubled and was looking back; the defendant said to her, " why in the hell don't you come on—you will repent your bargain before you get where you are going." This was about one mile from the river. Witness joined in the search for the body of deceased on Monday. He had three boats, which were locked and chained, on the side of the river on which he had seen the defendant and deceased; he found one of his boats on the opposite side of the river about a mile below where it had been chained, near where the body was found; the chain had been broken from the boat and left where it had been fastened; he found a walking-stick in the boat, which was the same that he had seen under the arm of the defendant on Sunday; the boat was of large capacity and showed no signs of having been swamped or sunk. He saw the body of the deceased after it had been recovered, and it had thirteen finger-nail marks on the throat and bruises on the nose. This witness also testified that when he saw defendant and child on Sunday the child had a fan.

Mary Hayes testified that about 4 o'clock on Sunday afternoon the defendant stopped at her house, about a mile from

the river, on the opposite side from where he was seen in the morning. He said that he had met with a great trouble; that while crossing the river with his wife and child the boat, which had a hole in the head, filled and sunk in the river and his wife was drowned; that his wife said: "I pray the Lord that you may be able to save yourself and the baby—you can't save me;" that after reaching the shore he looked back, but never saw either his wife or the boat; that he swam out with the child and bag of clothes; that he remained at the river three or four hours after his wife was drowned, looking for her.

This witness further testified that the defendant was wet up to the waist; that the child was wet on one side, and the bag of clothes was wet on the end; that the defendant had a paper fan which he said he had found in a house on the side of the river on which he then was, which was not wet; that there was a slough, about waist deep, between the house and the river, which the defendant had to cross in coming from the river. Witness proposed to go with the defendant to search for his wife's body, but defendant said he would wait till next morning.

Other witnesses testified to the same, substantially, as the last witness.

Two other witnesses testified that they saw the defendant about a quarter of a mile from the house of Mary Hayes, after he had been seen by her, to whom he gave substantially the same account as that given by her. They also testified that the defendant and child and clothes were wet, and that the defendant had a fan.

Several witnesses testified as to the finding of the body, whose statements were substantially the same, and, in substance, that the boat referred to was found in a ditch leading into the river; that the tracks of a man and woman were seen at the boat, and that they led to an old house in a field 400 or 500 yards from the river; that the tracks led through the house and, in a circuitous way, to the river, and

then up the banks, where, on account of the hardness of the ground, they were lost; that not far from where the tracks were lost they discovered a place which looked as if two persons had been scuffling with each other—the earth was trampled and the bushes torn and stripped of leaves; the body of the deceased was found about fifty or sixty yards below this point; that defendant stated to them that he had last seen the boat and his wife floating down the river, about eighty yards below where the body was found; that below the place where the scuffle seemed to have occurred and below where the body was recovered there were two tracks, one leading into the river and the other coming out. The defendant said these tracks were made by him when he swam after and went back into the river to look for his wife.

A witness testified that during the search for the body, and while the defendant was being questioned, "he stated that he supposed they would say he had killed his wife, so that he could marry Sarah Haddock."

Another witness testified that the defendant had asked if he could not go into another county and get a divorce from his wife; that he spoke about getting a divorce about two weeks before the death of deceased.

The owner of the boat testified that he showed the defendant the chain which had been broken from the boat, and that defendant owned it, but denied having used the boat.

The fan was exhibited, and the mother of the deceased testified that on Sunday morning, when the defendant left her house, she gave the child a fan, and that the one exhibited looked like that she had given to the child. Other witnesses, who saw the defendant after he had crossed the river, testified that the fan exhibited was like that which the defendant had.

Dr. Cobb, a physician, testified that he examined the body after it was taken from the river—to the marks on the throat, &c., and that, in his opinion, the deceased came to her death

by strangulation, or was unconscious when thrown into the water.

The counsel for the defendant insisted "that the circumstantial evidence offered by the State was not inconsistent with the prisoner's innocence." He further insisted "that the evidence offered by the State did not prove any malice in the defendant; and if the jury should believe that the defendant took the life of the deceased; that the evidence as to the scuffle and the fact that no deadly weapon was used tended to show that the defendant and the deceased had engaged in a sudden quarrel, and that in the heat of passion the defendant had choked her to death; and that if this were true the defendant would only be guilty of manslaughter."

His Honor did not so charge, but, upon the question as to manslaughter, charged the jury that, "according to the evidence in this case, it is murder or nothing." And again, when refusing the defendant's request for instructions upon the question of manslaughter, his Honor remarked to the jury: "I can't see, from the evidence in this case, that it is manslaughter. It is murder or nothing."

Verdict, guilty of murder. Judgment and appeal.

*The Attorney General,* for the State.
*Mr. W. W. Clark,* for the defendant.

DAVIS, J., (after stating the case). Was there error in his Honor's refusal to charge as requested or in the charge given? If the killing be proved, the *onus* is thrown upon the defendant to mitigate or excuse the act. To do this he must show, either by direct or circumstantial evidence, the mitigating facts or circumstances. It is not pretended that there was any direct evidence in this case to mitigate the offence, but the counsel who was assigned to defend the prisoner, and who, it is but just to say, has faithfully and ably discharged his duty, insisted that, as the evidence was all *circumstantial,*

the evidence of the scuffle and the fact that no deadly weapon was used are circumstances from which the jury might infer that there was a sudden quarrel, and that the killing was without malice, and that the questions of motive and malice were improperly taken from the jury by his Honor's charge.

The case of the *State* v. *Rash*, 12 Ired., 382, is relied on by defendant's counsel, but we fail to see its bearing upon this case. It is true, as was held in that case, that *all* the circumstances, *for* as well as against the prisoner, must be taken together and not separately. All the circumstances taken and considered together must constitute a *chain* leading to the fact. In this case there was a chain of circumstances strong and, we may say, conclusively, leading to the fact that the prisoner killed the deceased.

The killing having been proved, and the burden shifted to the prisoner to mitigate or excuse the homicide, he must do so either by direct proof or by a *chain* of circumstances. It is not claimed that there was any direct proof, and there was not only no *chain* of circumstances tending to mitigate the crime, but there was not a single link of a chain; for the single circumstance upon which he relies—the signs indicating a scuffle—is just as consistent, and in this case more so, with the fact that the deceased was struggling for her life against a brutal attack, as that there was a sudden quarrel and affray; it could, at the most, raise only a conjecture of a fact, which it was incumbent upon the prisoner to prove. It was not even a link, when the law required a chain of circumstances.

In the case of *State* v. *Haywood*, Phil., 376, there was no evidence of any quarrel or ill-will on the part of the accused toward the deceased. It was in evidence that the lock of the gun with which the homicide was committed was out of order and the hammer would not stand half-cocked, and the prisoner, when arrested, made the declaration that he did not know that the gun was loaded. It was held that this,

standing alone, was no evidence of manslaughter by accidental killing, as was insisted for the defendant.

In *State* v. *Smith*, 77 N. C., 488, it is said: "Homicide is murder unless it be attended with extenuating circumstances, which must appear to the satisfaction of the jury; and if the jury are left in doubt on this point, it is still murder."

In this case before us there is no evidence, and no aspect in which the evidence can be viewed, that presents the question of manslaughter. Upon the evidence it was "murder or nothing."

The chain of circumstances led conclusively to the fact that the prisoner killed the deceased. It was murder, and there is no error.

Affirmed.