## ERNEST DUNCAN

### *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon June 13, 1890.*

1. INSTRUCTIONS—*construed*—*on prosecution for manslaughter*—*self-defense*—*declining further combat, etc.* On the trial of one for manslaughter, the court, for the prosecution, instructed the jury as follows: "In case of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury to the person killing:" *Held,* that the instruction was not calculated to mislead, as being likely to eliminate from the consideration of the jury the theory that the defendant, although the first aggressor, subsequently declined further quarrel, and that his subsequent acts were done in self-defense.

2. SAME—*cured by a further instruction*—*so as to allow the theory of self-defense.* If an instruction for the People in such case is calculated to withdraw the consideration of the jury from his theory of self-defense, the giving of another instruction for the People which clearly recognizes the rule that the defendant, though the assailant in the first instance, might have retreated from that position by really and in good faith declining further combat, so as to be able to plead self-defense if the combat was afterward persisted in, will obviate all danger of misconception as to prior instructions.

3. SAME—*instruction presenting one theory*—*should be supplemented by the opposing theory.* Ordinarily it is not error to give an instruction embodying a correct proposition of law applicable to any tenable theory of the case, and the giving of such instruction will not usually require a reversal. If there is another theory to which this rule thus announced does not apply, it is usually the duty of the party relying upon such theory to ask the court to give such instruction as will properly present it.

4. SAME—*whether assuming the fact—as, in manslaughter—that there was a homicide—and that the accused struck the mortal blow.* An instruction on the trial of a party for manslaughter, that, "the killing being proved, the burden of proving circumstances that justify or excuse the homicide will devolve upon the accused, unless the proof on the part of the prosecution sufficiently manifests that the accused was justified or excused in committing the homicide," is not open to the objection that it takes from the jury the question of the killing by the

defendant, and excuses the prosecution from proving, in the first instance, that the homicide was unlawful, willful and felonious. It simply announces the statutory rule, that the killing of one human being by another is *prima facie* felonious, so as to throw the burden of justification or excuse on the person killing.

5. On the trial of one for manslaughter, the court instructed the jury, that if defendant brought on the conflict he could not claim the right of self-defense unless he really and in good faith abandoned the combat before the mortal blow was given: *Held,* that this instruction, standing alone, might probably to a certain degree be liable to the objection that it assumed as a fact that the mortal blow was given by the defendant; but where the following instruction submitted that question of fact fully and formally to the jury, the defect, if any, was cured or rendered harmless.

WRIT OF ERROR to the Circuit Court of Williamson county; the Hon. GEORGE W. YOUNG, Judge, presiding.

Messrs. CLEMENS & WARDER, Messrs. DUNCAN & RHEA, and Mr. J. W. HARTWELL, for the plaintiff in error:

A party may be an assailant without striking the first blow, and under peculiar circumstances a party may strike the first blow and not be the assailant. Wharton on Crim. Law, secs. 485, 493, 603-606, 628.

The fact that the principal encounter and exchange of blows took place after defendant returned to the sidewalk, shows that whatever cutting he did was after he had clearly manifested a disposition to decline the combat. Applicable to this line of defense it was that the instructions were so prejudicial. Instruction No. 2 was as follows:

"In case of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing."

Here the jury are told, that in the case at hand there were only two avenues of escape if he did the cutting at all, and one was, that the deceased had either actually inflicted upon him a serious and highly provoking injury, or was attempting

to commit such injury on defendant. This we claim is not the law.

The People's fifth instruction is even more prejudicial. It assumes as proved the principal fact in the case,—the killing. (*Barr* v. *People*, 113 Ill. 473.) And the sixth instruction also assumes that defendant gave the mortal blow.

These various features running through the instructions, of taking for granted propositions that should have been left for the jury to find, are erroneous. *Roach* v. *People*, 77 Ill. 29; *Barr* v. *People*, 113 id. 473; *Town of Evans* v. *Dickey*, 117 id. 291; *City of Elgin* v. *Beckwith*, 119 id. 376; *Railroad Co.* v. *White*, 26 Bradw. 591; *Milling Co.* v. *Thomas*, 27 id. 137; *Kranz* v. *Theiben*, 15 id. 483; *Railroad Co.* v. *Warner*, 123 Ill. 49; *Jupitz* v. *People*, 34 id. 521; *Conkwright* v. *People*, 35 id. 207; *Bond* v. *People*, 39 id. 28; *Earll* v. *People*, 73 id. 334; *Weyrich* v. *People*, 89 id. 99.

Where there is a conflict in the evidence, the strictest accuracy is required in the instructions. *Hoge* v. *People*, 117 Ill. 47; *Railroad Co.* v. *White*, 26 Bradw. 591; *Milling Co.* v. *Thomas*, 27 id. 137; *Roby* v. *Murphy*, id. 399; *Fernandes* v. *McGinnis*, 25 id. 165; *Dempsey* v. *Bowen*, id. 192; *Railroad Co.* v. *Van Patten*, 74 Ill. 94.

Even where there are other instructions stating the rule of law correctly, yet the erroneous instructions can not be esteemed harmless. It is unfair to suspend the defendant's rights on the chance that as between instructions contradictory and inconsistent the jury will certainly guess the correct ones. *Railway Co.* v. *Snyder*, 117 Ill. 383; *Hoge* v. *People*, id. 48; *Carter* v. *Carter*, 62 id. 449; *Armstrong* v. *People*, 38 id. 513; *Steinmeyer* v. *People*, 95 id. 390.

Mr. George Hunt, Attorney General, for the People:

The instructions given comprise a full and fair statement of the law of the case, without any foundation for the complaints made.

The first form of the instructions is a literal copy from the statute. Where an instruction states only a legal proposition, it need not make reference to the evidence. *Belt* v. *People,* 97 Ill. 463.

An omission in an instruction, even if error, is no ground for a reversal, if the defect is clearly supplied and corrected in others given. In such case the error works no injury. *Tomle* v. *Hampton,* 129 Ill. 379.

The complaint of the fifth instruction, that the clause, "the killing being proved," takes the question from the jury, and assumes that the killing has been proved, is not well taken. It is only equivalent to saying, "if the killing is proved," or, "when the killing is proved."

Complaint is made of the sixth instruction—that it assumes the mortal blow was given. If it does so assume, that is not a question about which there was any dispute or doubt. The giving of the mortal blow was proven, and substantially conceded, and there is no error in the instruction. The theory of the defense was, first, that the evidence did not warrant "the conclusion, beyond a reasonable doubt, that the defendant first struck the deceased;" and second, that if he did strike the deceased the first blow, the circumstances were such that "he could lawfully strike without incurring the responsibility of being held an assailant." Under these circumstances, even if the instruction does assume the giving of the mortal blow, there is no error which could injure the accused, and no error for which the judgment should be reversed.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

Ernest Duncan, the plaintiff in error, was indicted in the Circuit Court of Williamson county for the crime of manslaughter, and, on the trial, was convicted and sentenced to imprisonment in the penitentiary for the term of five years. The grounds upon which he now seeks to have the conviction

set aside and to be awarded a new trial are, first, that the verdict of the jury is unsupported by the evidence, and, second, that the jury were misled by the instructions as to the law given to them by the court.

The circumstances under which the homicide was committed are briefly as follows: On the 4th day of July, 1888, at about nine or ten o'clock in the evening, George White, the deceased, in company with his brother William, left a saloon situated at the south-east corner of the public square in Marion, Williamson county, and walked along the south side of the square to South street, a street running south from a point opposite the center of the square. On the west side on South street fronting on the square, is a building known as Cantor's store, said building having also a door opening on to South street near the corner. The defendant and one Gibbs were at the time sitting in said door opening on to South street. The deceased and his brother crossed South street and halted on the corner at Cantor's store. The evidence as to what then occurred is to some degree conflicting. The night was quite dark, and the only witnesses who were upon the spot, or near enough to see what occurred with distinctness, were William White, the brother of the deceased, and Gibbs who was sitting in the door-way with the defendant.

William White testifies that he and the deceased reached the corner and halted just north of the door of Cantor's store, and that two men were sitting in the door; that one of them spoke up and said: "Where in hell are you fellows going?" and that the deceased replied: "It is none of your damned business;" that the defendant then jumped up in front of them and said that he would make it his business; that witness stepped in front of the deceased and told the defendant to "hold up;" that when he said that, the defendant struck the witness, and the witness thereupon threw up his arm and shoved or knocked the defendant off from the sidewalk into the street; that when the defendant went off from the sidewalk,

the deceased was standing behind and north of the witness; that the defendant, on reaching the street, fell partly or entirely down, but got up immediately and returned to the sidewalk, taking a north-westerly direction so as to get onto the sidewalk north of the deceased; that immediately after reaching the sidewalk he struck the deceased a blow; that the witness, finding that he himself had been wounded, proposed to the deceased that they go to a certain drug store which was near by, saying that he thought that he had been cut; that the deceased consented, saying that he also had received a blow on his arm; that on reaching the drug store, it was found that both the witness and the deceased had been wounded, the wound of the latter being on the upper part of the left arm, and made apparently with a knife, and the knife having, as was ascertained upon subsequent examination, penetrated the bone and splintered off portions of it.

Witness Gibbs testifies that, as the deceased and his brother stopped on the corner near Cantor's store, the deceased commenced doing something which indicated that he was about to urinate; that the defendant, seeing what he was about, called out, saying: "I would not do that if I were you; you might get arrested;" that one of them, which the witness thinks was the deceased, replied: "What business is that to you, you damned son of a bitch?" that defendant jumped up and said: "You don't know who you are talking to, do you?" that at about that time William White struck the defendant and knocked him into the street, but witness admits that the first blow was struck by the defendant, although he thinks it was received by the deceased and not by his brother; that defendant returned to the sidewalk in a south-westerly direction, so as to reach the sidewalk some seven or eight feet south of the door; that the deceased and his brother had in the meantime advanced down the sidewalk so that when the defendant got back, they were all together; that several blows passed between them, and that the witness thereupon got up and inter-

posed, saying that it was not fair for two men to be fighting one, and took hold of them and finally succeeded in parting them. This witness testifies that just before the first blow was struck, and before the defendant was knocked off the sidewalk, William White run his hand into his pocket, but there is no pretense that either he or his brother drew or had in his possession any weapon at that time.

Some other witnesses who were so far away that, owing to the darkness, they could not see the affair with distinctness, heard portions at least of the colloquy between the defendant and the deceased which immediately preceded the affray, and testified to what they heard, and their testimony as to the words used corresponds in the main with that of Gibbs. The evidence also tends to show that during the day and evening preceding the affray, the deceased was to some extent under the influence of intoxicating liquors, and also that during the day he had in his possession a revolver and a dirk knife, and also that at one time he had in his pocket and exhibited a large rock, but there is no evidence that he had either of those weapons in his possession at the time of the affray, or that the defendant had any reason to suppose that he was armed with weapons of any kind.

It appears that for several days the condition of the deceased, though considered dangerous, was such as to give promise of ultimate recovery, but that blood-poisoning afterward ensued which rendered a fatal result highly probable if not absolutely certain. As a last resort his arm was amputated, but he survived the operation but a few hours.

It can not be doubted, we think, that the evidence warranted the jury in finding that the defendant inflicted upon the deceased the wound which caused his death. This seems to be a fair conclusion to be drawn from the testimony of the witnesses on both sides. The only attempt to justify or rather to excuse the homicide is on the theory of self-defense, and while there is some evidence on which that theory may be

based, we are of the opinion that any candid perusal of the record will produce the conviction that the defendant commenced the affray, and that he was the aggressor throughout. To state the case most strongly for the defendant, the evidence applicable to the issue of self-defense was conflicting, with at least an apparent preponderance against the defendant. Under these circumstances, unless there was error in the instructions to the jury as to the law, the verdict finding against the defendant on that issue must be held to be conclusive.

The only remaining question then is, whether there was any error in the instructions. The first instruction given at the instance of the prosecution consisted of the definition of the crime of manslaughter in the exact language of the Criminal Code. The second instruction was a literal copy of the first clause of the section of said Code defining voluntary manslaughter, viz:

"In case of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury to the person killing."

It is said that this instruction, though stating a manifestly correct proposition of law, had a tendency to mislead the jury because, as applied to this case, it was likely to eliminate from their consideration the theory that the defendant, although the first aggressor, subsequently declined further quarrel, and that his subsequent acts were done in self-defense. It is difficult to see how, if we are permitted to attribute to the jury any considerable or even an ordinary degree of intelligence, such could have been the effect of the instruction, but if the defendant's counsel were apprehensive that it might have that effect, they should have asked further instructions which would have set the jury right in the matter and rendered misconception impossible. Ordinarily it is not error to give an instruction embodying a correct proposition of law applicable to any

tenable theory of the case, and the giving of such instruction will not usually necessitate a reversal of the judgment. If there is another theory to which the rule thus announced does not apply, it is usually the duty of the party relying upon such theory to ask the court to give such instructions as will properly present it. But in this case, the sixth instruction given at the instance of the prosecution clearly recognized the rule that the defendant, though the assailant in the first instance, might have retreated from that position by really and in good faith declining further combat, so as to be able to plead self-defense if the combat was afterwards persisted in by the other party. It would thus seem that all danger of misconception, if any such there was, was obviated by the instructions given for the prosecution.

What we have said applies also to the defendant's criticism of the fourth instruction given for the prosecution, which was merely a statement of the statutory definition of an assault, viz: "An unlawful attempt, coupled with a present ability to inflict upon the person of another a violent injury."

Objection is made to the fifth instruction for the prosecution, which was as follows:

"The killing being proved, the burden of proving circumstances that justify or excuse the homicide will devolve upon the accused, unless the proof on the part of the prosecution sufficiently manifests that the accused was justified or excused in committing the homicide."

It is claimed that this instruction assumed, and therefore took from the jury, the question of the killing of the deceased by the defendant, and also excused the prosecution from proving, in the first instance, that the homicide was unlawful, willful and felonious. It is clear that neither of these criticisms can be sustained. This, like the four preceding instructions, was a mere copy of a certain provision of the Criminal Code, this being in the exact language of section 155 of the act of 1874 in relation to Criminal Jurisprudence. It was, and was

doubtless understood by the jury to be, a mere statement of an abstract legal proposition applicable alike to all prosecutions for homicide, and the words with which it begins, viz, "the killing being proved," could not have been understood as an assumption that in this case the killing had been proved, but a statement of the rule that when in any prosecution, for a homicide the killing is proved, the burden of justifying or excusing the homicide is thrown upon the accused. Nor did the instruction, in any just sense, relieve the prosecution from proving an unlawful and felonious killing. It merely announced the statutory rule, that the killing of one human being by another is prima facie felonious, so as to throw the burden of justification or excuse on the person killing.

The sixth and seventh instructions given for the prosecution were as follows:

"6. If you believe, from the evidence, beyond a reasonable doubt, that the defendant brought on the difficulty by first assaulting the deceased, then the defendant can not avail himself of the right of self-defense in order to shield himself from the consequences of his acts, however imminent the danger in which he may have found himself in the progress of the difficulty, unless you further believe, from the evidence, that the defendant really and in good faith, abandoned the combat before the mortal blow was struck.

"7. If the jury believe, from the evidence, beyond a reasonable doubt, that the defendant cut the deceased, George White, in the arm with a knife, or other instrument capable of inflicting a similar wound, as charged in the indictment, it is no excuse to say that the deceased would not have died if he had taken proper care of himself, or that neglect, or the want of proper applications to the wound had brought on blood-poisoning, and of that he died, provided you believe, from the evidence, beyond a reasonable doubt, that the wound was the primary or principal cause of his death."

It is insisted that the court, by the sixth instruction, assumed as a fact, that the mortal blow was given by the defendant, and so withdrew that question from the jury. It is probable that this instruction, standing alone, would, to a certain degree, be liable to the objection here made, but when it is read in connection with the seventh instruction which immediately follows, and in which that question is fully and formally submitted to the jury, as a question of fact to be determined by them from the evidence, there seems to be no rational ground for the supposition that the jury could have been misled as to the position of that question, or as to their duty in relation to it.

More or less fault is found with each of the remaining instructions given at the instance of the prosecution, but we do not deem it necessary to prolong this discussion further than to say, that we have carefully considered the various points made, and do not think that any one of them is tenable. We are of the opinion that the jury were instructed with substantial accuracy, and there is no ground apparent to us upon which the judgment of the Circuit Court should be disturbed.

The judgment will be affirmed.

*Judgment affirmed.*