## PEOPLE *v.* McGONEGAL.

*(Supreme Court, General Term, First Department.* December 31, 1891.)

1. CRIMINAL LAW—CONTINUANCE—PREPARATION FOR TRIAL.
   A motion for a continuance, supported by papers containing a mere statement of counsel that they have been unable to get ready, with only a meager statement of facts tending to support such assertion, where it does not appear that counsel could not have been ready by the use of due diligence, is properly denied.

2. COMPETENCY OF JURORS—PREVIOUSLY FORMED OPINION.
The fact that a person offered as a juror on a trial for manslaughter has read newspaper accounts of the coroner's inquest, and formed an opinion from such accounts, not knowing that they were derived from the evidence of witnesses under oath, which opinion he states it would take evidence to remove, does not render him incompetent if it also appears that, on the evidence produced, uninfluenced by any opinion thus acquired, he could determine the issues involved. *Greenfield* v. *People*, 74 N. Y. 277; *People* v. *McQuade*, 18 N. E. Rep. 156, 110 N. Y. 284, distinguished.

3. JURY—CHALLENGES.
Code Crim. Proc. § 385, requiring that challenges must be taken first by the prosecution and then by the defendant, only applies to challenges in the various classes, —*First*, to the panel; *second*, to the juror, for general disqualification; *third*, for implied bias; *fourth*, for actual bias; and, *fifth*, peremptorily; and it does not require the prosecution to exhaust its peremptory challenges before requiring defendant to make any challenge.

4. CRIMINAL LAW—EVIDENCE—ACCOMPLICES.
On a trial for manslaughter by procuring an abortion from which the woman died, the fact that a witness, with knowledge of the pregnancy of deceased, went with her to defendant, where it does not appear that she knew that deceased was to have an abortion committed, nor that she went for such purpose, does not make her an accomplice.

5. ABORTION—NECESSARY OPERATION—BURDEN OF PROOF.
Under Pen. Code, § 191, making the commission of an abortion resulting in death manslaughter in the first degree, unless the same was necessary to preserve the life of deceased, the burden of proving the exception is upon the party charged with the crime.

6. INSTRUCTIONS—CALLING ATTENTION TO EVIDENCE.
The fact that the court in its charge stated that it would call the attention of the jury to such evidence as it deemed material, and that the court did not present all the evidence, is no ground for reversal.

7. ABORTION—INSTRUCTIONS.
On a trial for manslaughter, in procuring an abortion resulting in death, it is not error for the court to quote the statute defining the crime, though there was no evidence that defendant had made use of all the means designated therein.

Appeal from court of general sessions, New York county.

Indictment of Henry G. McGonegal for manslaughter in procuring an abortion, resulting in death. Defendant appeals from a judgment of conviction. Affirmed. See 16 N. Y. Supp. 379.

Argued before VAN BRUNT, P. J., and ANDREWS, J.

W. T. *Birdsall*, (*C. W. Brooke*, of counsel,) for appellant. *De Lancey Nicoll*, Dist. Atty., (*Bartow S. Weeks*, of counsel,) for respondent.

VAN BRUNT, P. J. The defendant herein was indicted for the crime of manslaughter in the first degree for having committed an abortion upon one Annie Goodwin, in consequence of which she died. The jury having convicted the defendant, from the judgment thereupon entered this appeal is taken, and in support thereof the appellant urges various grounds upon the consideration of the court. The *first* is that a motion to adjourn the trial of the defendant was improperly denied; *second*, that in the formation of the jury improper persons were impaneled, contrary to the provisions of law; *third*, that it was error to deny the defendant's motion to advise an acquittal at the close of the case for the prosecution; *fourth*, because of alleged errors in rulings as to the admission and exclusion of evidence; *fifth*, because of errors in the charge of the court; and, *sixth*, upon the ground that the verdict was against the weight of evidence.

In respect to the motion to adjourn, it is sufficient to say that no legal ground for any such adjournment was presented to the court. The cause had been set down for trial at the time at which it was called, and there was nothing presented upon the papers which tended to show but that, if the defendant's counsel was not ready for the trial, he might have been ready had due diligence been used. The papers contained a mere statement of counsel that they had been unable to get ready, with a very meager statement of facts

tending to support this assertion. The absence of alleged papers, which it is claimed, being in the hands of the assistant district attorney, were not within the reach of the defendant, does not seem to have been of great materiality in view of the fact that the full record of the proceedings before the coroner was in their possession.

In respect to the errors which it is alleged were made in the impaneling of the jury, it will not be necessary to refer to the numerous instances which are cited upon the defendant's points, because the principles which are applicable to one seem to control the disposition of all. The proceedings in reference to the impaneling of the juror Miller seem to present the question in as strong a form as any of the others, and the objections relating to his case will be specially considered. When the said juror was called he was challenged by the people for bias, and, upon examination by the district attorney, he stated that he could fairly and impartially, without any bias, try this case between the people on one side and the defendant on the other upon the evidence which would be submitted. Upon being examined by the defendant's counsel, he stated that he read certain newspapers, and that he recollected reading about this case, and that it had been stated in the papers that Annie Goodwin had been killed by the criminal malpractice of the defendant, McGonegal; and he thinks he read the whole proceedings, and that, if he read the whole proceedings, he read that the body was found and brought to the coroner. He was then asked whether he read the proceedings before the coroner. He answered: "*Answer.* Yes, sir. *Question.* And that helped you to form the opinion you have now, didn't it? *A.* Yes, sir; just as much as any other article I read in the paper. *Q.* As to the guilt or innocence of the prisoner? *A.* Yes." Then, upon examination by the district attorney, the juror stated that he did not read anything that he knew to be evidence in the case. What he read he supposed to be an account in the newspapers of the occurrence, and that he did not recollect that he was aware that he was reading the testimony of witnesses under oath. And he again stated that, notwithstanding the impression or opinion that he had formed, he could still fairly decide the case according to the evidence, and be governed by the evidence only. Upon recross-examination by the defendant's counsel he stated that it would take evidence to remove the impression from his mind, but if he went into the jury-box he could determine the issue involved in this action upon the evidence produced in court, uninfluenced by any opinion he then had. He stated that he thought he had read the whole of the proceedings from beginning to end, but whether he read the proceedings before the coroner he could not exactly say; and that, when he said he had read it from beginning to end, he meant that he had read whatever was in the newspapers that he saw, just like any other article; and he repeated that he could not say that he was aware, when reading the report of the proceedings at the inquest, that he was reading the testimony of sworn witnesses; that he read them as newspaper reports. And, after having been examined and re-examined upon this subject, and having stated again and again that he could go into the jury-box and determine the guilt or innocence of the defendant upon the evidence produced in court, and that alone, uninfluenced by any impression he then had, the court, after seeing the juror, and hearing his testimony, and in the light of his statement as to his condition of mind, held him to be a competent juror, and overruled the challenge. In this, we think, there was no error. The facts in reference to this juror, as shown by the record, distinguish it in important particulars from the *Cases of Greenfield* (74 N. Y. 277) and *McQuade*, (110 N. Y. 284, 18 N. E. Rep. 156.) In those cases the juror had read what purported to be *verbatim* accounts of proceedings in court upon the trial of the defendant, and upon reading that evidence had formed an opinion; and it was claimed that, having read the evidence in the case, and formed an opinion, the presumption was that the juror would nec-

essarily form the same opinion upon hearing the same evidence repeated in court. But in the case at bar the juror expressly states that he did not understand that he was reading the testimony of witnesses under oath before the coroner; that he thought they were simple newspaper accounts of the proceedings; and he repeats again and again that, notwithstanding the opinion or impression he might have, he would be governed by the evidence only, and would find a verdict according to the evidence produced upon the trial in court. But it is claimed that the witness said that he would carry the opinion which he had formed into the jury-box, and that that would remain until evidence was produced to remove it. That necessarily would be the condition of mind of any juror who had ever formed any impression or opinion in respect to the case. Until he heard something more about the case, undoubtedly the same impression would remain. Although the juror may have an impression or opinion, derived from newspaper accounts, when he comes into the jury-box and is sworn as a juror, and hears the evidence in the case, if he is an honest and fair-minded man he would naturally find his verdict according to the evidence which he hears from the lips of witnesses, rather than upon the impressions derived from the statements of reporters, contained in newspapers. And where the evidence shows that, notwithstanding the impression which a report in a newspaper may have made upon his mind, he can and will decide the case according to the evidence, and be governed by the evidence alone, the mere fact that he states that the impressions which he received from such accounts would remain in his mind until he heard the evidence in the case, in no way disqualifies him. The idea that a juror, by simply taking the oath, can banish from his mind an impression which had been therein formed in regard to a fact from reading what is supposed to be a recital of it, is absolutely without foundation; and this is recognized by the provisions of the Code, which makes a juror eligible where the court is satisfied that, notwithstanding the impression or opinion, the juror will find a verdict according to the evidence, and the evidence alone. Upon an examination of the record we have been unable to find any reason to suppose that any but fair and impartial jurors were impaneled. It is further urged, however, that the people should have exhausted all their challenges, and that it was error, after the people had challenged for bias, and withdrawn that challenge, and the defendant had challenged for bias, and examined the jurors, to allow the prosecution to peremptorily challenge such jurors; it being claimed that all the challenges of the people should be exhausted before the defendant should be required to make any challenge. We find nothing in the act which sanctions any such practice. It is true that section 385 of the Code of Criminal Procedure states that challenges to an individual juror must be taken first by the people and then by the defendant. But it is apparent that this applies to the different classes of challenges which are enumerated in the next section, which provides that challenges of either party must be taken—*First* to the panel; *second,* to the individual juror for general disqualification; *third,* to the individual juror for implied bias; *fourth,* to the individual juror for actual bias; and, *fifth,* peremptory. All that was intended by this provision was to require the people to exercise their right to challenge as to any one of these classes before the defendant could be called upon to exercise his right as to such class. The same question was raised in the case of *People* v. *Carolin,* 115 N. Y. 658, 21 N. E. Rep. 1059, and it was not thought of sufficient importance by the court of appeals to notice it in their opinion.

It is urged that there was not sufficient evidence by the prosecution showing that the crime charged in the indictment had been committed, and that the only evidence of the fact of abortion was derived from a partial autopsy, hastily made, under circumstances of great public excitement, and with an evident predetermination to find nothing else; and that, even if such a crime had been committed, there was no evidence connecting the defendant with

the commission of the alleged crime, he having had no opportunity; and that, from the evidence in the case at the close of the prosecution, the only conclusion which could be drawn was that it was the act of the deceased herself or of some other person. And in this connection it is urged that the whole case for the prosecution, so far as it in the slightest degree tends to connect the defendant with the commission of this crime, rests upon the uncorroborated testimony of an accomplice of the defendant,— one Sadie Traphagen; and that, as no conviction can be had upon the testimony of an accomplice unless corroborated by such other evidence as tends to connect the defendant therewith, the court should have directed an acquittal. There is no evidence whatever that Sadie Traphagen was an accomplice in the commission of this abortion. The mere fact that she went to the defendant's with the deceased does not in any way make her an accomplice, even though she knew of the deceased being pregnant. There was nothing to show that this witness knew that the deceased was to have an abortion committed, nor that she accompanied the deceased to the defendant's for that purpose. But, even if she were to be considered as an accomplice, there are facts and circumstances established by the evidence of other witnesses which certainly tend to connect the defendant with the commission of this crime, if any crime was committed. The Penal Code (section 181) provides that no person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of the killing by the defendant as alleged, are each established as independent facts; the former by direct proof, and the latter beyond a reasonable doubt. In other words, the death of the person alleged must be established by positive evidence, but the fact of killing by the defendant may be proved by circumstantial evidence; but the evidence must be of such a character as to establish the guilt of the defendant beyond a reasonable doubt. In the case at bar the death of the person who was alleged to have been killed is established by positive evidence. The body was recognized by those who were familiar with her, and positively identified. The next step is the question as to whether the defendant was responsible for her death, and this is established by circumstantial evidence.

The evidence shows that the deceased visited the defendant on the 2d of July; that she then informed him of her condition, and he evidently inferred that she was applying to him to be relieved therefrom, because his reply to her, as he states it, was that he would not do anything for her in that respect; that then the deceased intimated to him that she had been doing something towards that end herself, and he sent her away with the statement that she must go home, and take care of herself, and that he would treat her, if she wanted him, to the best of his ability; and that on the same day the deceased removed from the house at which she had been staying with the witness Traphagen to a Mrs. Collins, and on the 4th of July she was there taken sick, and the defendant went to see her. He states that he did not recognize the deceased as having called upon him before; that he did not make any particular examination of her, but was met at the threshold of his visit with a demand by Mrs. Collins that the deceased should be removed; that, if there was anything wrong about her, she could not stay in that house; and she did not stay, but was removed by the defendant at about 11 o'clock that night, when she was taken to a Mrs. Shaw's, at 117 East 105th street, the deceased having told defendant, after he had gotten her into his wagon, that she had nowhere to go. The defendant committed her to the charge of Mrs. Shaw, and visited her there, until her death, on the succeeding 12th of July. It does not clearly appear when the defendant first recognized his patient as the person who had visited him at his home on the 2d of July. It appears, according to his testimony, that during all this time of his attendance upon her he was treating her for rheumatism; and that he made no examination whatever to ascertain whether what had been done, as the witness says, by the deceased, had had any

results or not. Although it does not appear distinctly when he first recognized the deceased as his former visitor, it is to be inferred from the nature of the defendant's testimony that such recognition took place early after the visit to Mrs. Collins and her removal by the defendant to Mrs. Shaw's. The defendant then knew, from the statement which had been made to him by the deceased, according to his own testimony, that she was pregnant, and had been attempting to commit an abortion; and yet, if his story is to be believed, he made not the slightest investigation into her condition, or as to whether those attempts at an abortion had been followed by any result, and withal knowing that the symptoms of peritonitis and rheumatism were to some extent identical. Upon the death of the deceased in the middle of the night the defendant removed her body to the undertaker's, gave a certificate of death, which contained many false statements, and the deceased was buried. It further appears from the testimony of the witness Traphagen that a few days subsequently, upon two occasions, the defendant came to her for the purpose of getting her to write or sign a letter purporting to come from the deceased, in which the deceased should apparently say that she was doing nicely with an old friend of hers, working every day and Sunday, and would be at home in a month or two; not to worry. About 10 days after her decease her body was exhumed, and an autopsy had, which showed, as was testified to by the physicians making it, that death was caused by peritonitis, resulting from an abortion which had been committed upon the deceased. Upon the part of the defendant expert evidence was offered tending to show that from the examination made by the physicians, as testified to by them, it was impossible that they could state that death had been produced by an abortion.

It would appear, upon a consideration of the features of this case, that it was eminently one for the jury. The defendant admits that the deceased told him she was pregnant, and that an abortion had been attempted, and promised, according to his own story, to attend her in case she wanted him, and to do the best he could for her. When called upon to visit her at Mrs. Collins, although he pretends not to have recognized her at that time, he expresses no astonishment when he is informed by Mrs. Collins that he must take her away, and in the middle of the night he removes her to Mrs. Shaw's, and attends her there until her death, and then, in the night again, removes her body to the undertaker's, and gives a certificate of death, which certainly contained false and erroneous statements, calculated to prevent the establishment of the identity of the deceased; and during all this time, according to his own statements, he made no examination whatever of the deceased to ascertain what the effect of this attempt at an abortion had been. The reasons given by the defendant for his certainly somewhat extraordinary actions were for the consideration of the jury, and they might well determine that his conduct was caused by a consciousness of guilt and a fear of detection.

But it is urged that the prosecution failed to prove that, even if an abortion was committed, the same was not necessary to preserve the life of the deceased, and, consequently, the defendant was not guilty. A reading of the section of the Code under which the indictment was found shows with reasonable clearness that, if a defendant seeks to excuse himself from the charge of having committed an abortion, it is necessary that he establish the fact that the same was necessary to preserve the life of the deceased. The commission of an abortion is made manslaughter in the first degree unless the same was necessary to preserve the life of the deceased. In order to escape from the crime, the burden is upon the defendant to establish the exception. It is not for the people to prove the negative. This seems to be the plain language of the Code, and it is in consonance with the ordinary rules governing evidence.

We have examined the large number of exceptions taken to the admission and exclusion of evidence, and find no error has been committed by the court

which in any way prejudiced the defendant. A large number of the exceptions to the exclusion of testimony were entirely overcome by the fact that the evidence sought to be introduced by the question excluded had either been previously introduced, or similar questions were subsequently answered.

Neither do we find any errors committed by the court in its charge to the jury. The principal criticism upon this point is that the court in its charge stated that it would call the attention of the jury to such evidence as it deemed material, and that no presentation of all the evidence was made by the court to the jury, but only of such portions as it deemed material. We are not aware that the court is bound to rehearse the whole of the testimony to the jury in its charge, or that it is error simply to refer to such portions of the testimony as will illustrate the questions of law which it is necessary to present to the jury. The court committed no error, certainly, in calling attention to the section of the Code which defined the crime of which the defendant was convicted, although it might be true that there was no evidence that the defendant had made use of all the means which were there designated. The point that the requests to charge were all, except the first, substantially refused, is not borne out by the record. It appears, so far as these requests entitled the defendant to have them charged, they were included in the charge of the court. Most of the requests involved a direction to acquit, or that the jury must be satisfied beyond question of the fact that the defendant was instrumental in causing the death of the deceased. Such is not the rule of law, and it would have been error to submit any such proposition to the jury. The court distinctly submitted to the jury as to whether they were satisfied from the evidence beyond a reasonable doubt that the defendant had committed the abortion. After having submitted this proposition to the jury, it should not be required to reiterate the proposition, and say that the evidence must fix to a moral certainty the guilt upon the accused, and no one else. And, after having charged the jury that the circumstances must be of such a character that they point to guilt to the exclusion of any other reasonable hypothesis, it was certainly no error to refuse to charge a request containing precisely the same proposition. The presentation of the case to the jury by the charge of the court seems to have protected all the rights of the defendant, and to have placed before the jury the fact that, before they could convict, the evidence, being circumstantial, must point indubitably towards the guilt of the defendant. There seems, therefore, from the record, to have been no error committed which was prejudicial to the defendant. But we cannot allow to pass without comment the manner in which this case upon appeal has been prepared, nearly 50 pages of the record consisting of the speeches of the counsel to the court, which form no part of the record, and should not have been certified to this court as part thereof. The conviction should be affirmed.