# GLICK LUMPKIN v. STATE.

No. A-131.   Opinion Filed May 9, 1911.

Dissenting Opinion Filed May 11, 1911.

(115 Pac. 478.)

1.   **APPEAL—Record—Case-Made.** First. (a) Remarks made by a trial judge expressive of his private opinion of a case at the time that he overruled a motion for a new trial, and pronounced judgment against a defendant, do not constitute any part of the trial of the case, and should not be incorporated in the case-made.

(b) It is the right and duty of a trial judge to incorporate in a case-made any statement· of facts or matters that occurred in his presence during the trial which he thinks should be brought to the knowledge of this court, and which are necessary to enable this court to understand the rulings made during the trial; but the private opinion of the trial judge with reference to the merits of the case, which is not expressed in the presence of the jury and which therefore could not influence them adversely to the rights of the defendant, does not concern this court, and cannot in any manner affect its decision upon questions of law or fact submitted to it for consideration. It is therefore improper to incumber the record with such remarks.

(c) It is the duty of the county attorney to carefully read over and consider every line in a case-made before it is presented to the trial judge for his approval and signature, and, if any matters have been improperly incorporated in the case-made, the county attorney should call such matters to the attention of the trial judge and move that they be stricken from the case-made.

(d) The trial judge is justified in approving a case-made after it has been submitted to and approved by the county attorney, without first reading the entire case-made, upon the ground that it is the duty of the county attorney to call the attention of the trial judge to any errors contained in such case-made.

2.   **HOMICIDE—Murder—Trial—Instructions.** Second. (a) Section 6854 of Snyder's Compiled Laws of Oklahoma 1909 is as follows: "Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." It is not error for the trial court to give this section in charge to a jury in a homicide case.

(b) **Hawkins v. United States**, 3 Okla. Cr. 651, 108 Pac. 561; **Prince v. United States**, 3 Okla. Cr. 700, 109 Pac. 241; **Culpepper v. United States**, 4 Okla. Cr. 103, 111 Pac. 679, reaffirmed.

(c) Our statutes require a trial judge to instruct the jury as to all matters of law which he thinks are necessary for their information in giving their verdict. If counsel for a defendant are of the opinion that additional instructions should be given to the jury, it is their duty to reduce them to writing, submit them to the trial judge, and request that they be given to the jury. If they fail to do this, a conviction will not be reversed unless this court is of the opinion, in the light of the entire record and instructions of the court, that by the failure of the trial court to instruct the jury upon some material question of law the defendant has been deprived of a substantial right.

3. **HOMICIDE—Manslaughter in First Degree—Sufficiency of Evidence.** Third. For facts fully sustaining the verdict of the jury where a defendant was convicted of manslaughter in the first degree, see statements contained in the opinion of the court.

(Syllabus by the Court.)

McAdams, Special Judge, dissenting.

*Appeal from District Court, Noble County; W. M. Bowles, Judge.*

Glick Lumpkin was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Judge Doyle, having been of counsel in this cause, was thereby disqualified, and did not participate in the hearing, consideration, and decision of this case, and the Governor appointed Hon. E. G. McAdams as special judge to preside in the place of Judge Doyle.

*H. B. Martin,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, PRESIDING JUDGE. In this case appellant relies upon a number of different grounds to secure a reversal of the judgment against him. We do not deem it necessary, however, to discuss more than three questions presented, which are as follows: First, remarks made by the trial judge when the motion for a new trial was overruled and sentence was pronounced against the defendant; second, objections to one paragraph of the charge of the court; third, is the verdict contrary to the evidence?

First. As to the first question, we are of the opinion that the remarks made by the trial judge when the motion for a new trial was overruled and judgment of the court was pronounced against the defendant do not constitute any part of the trial of this cause, and that they were improperly incorporated in the record. Remarks made by a trial judge upon such an occasion could not have any. influence whatever upon the action of the jury in convicting the defendant, because they are made after the verdict has been rendered. If a judge in overruling a motion for a new trial desires to review the testimony, we know of no reason why he could not do so, except that it might be prejudicial to a defendant in the event the judgment of conviction was reversed and a new trial was ordered; but, be this as it may, such remarks do not constitute any part of the trial and should not be incorporated in the record. It is the right and duty of the judge to incorporate in the case-made a statement of facts as to any matters that occurred during the trial in his presence which he thinks should be brought to the knowledge of this court, and which are necessary to enable this court to understand the rulings that were made during the trial of the case. But the private opinion of a trial judge with reference to a case does not concern this court, and could not in any manner affect our decision upon any question which might be submitted to us for consideration. It is therefore improper to incumber the record with remarks made by the trial court with reference to a case which were not made during the trial, and which could not possibly have influenced the jury improperly to the injury of the appellant. There was no order of the trial judge directing that the remarks made in this case should be incorporated in the record. The entire remarks indicate that the judge was only expressing his private opinion with reference to the case.

. These remarks were evidently inserted in the record by counsel for appellant; and, as the record contains nearly 800 pages and the trial judge would not have time to read it all over and see that each statement was correct, and as the case-made was ap-

proved by the county attorney, the trial judge was justified in signing and approving it as presented. We do not for one moment believe that the distinguished judge who presided at this trial ever intended to send these remarks up to this court for review.

This illustrates how necessary it is for the county attorney to carefully read every line in a case-made before it is presented to the trial judge for his signature, and to file objections to any statement made therein which it should not contain. We have been forced to reverse a number of cases which would have been affirmed had it not been for the carelessness of county attorneys in this respect. The remarks made by the trial court in this case constitute no proper part of the case-made, and are therefore stricken from the record, and will not be considered by this court for any purpose whatsoever.

Second. The court, among other things, instructed the jury as follows:

"You are instructed that, upon a trial for murder, the commission of a homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

To this instruction defendant duly excepted. The instruction as given is in the exact language of the statute. Section 6854 of Snyder's Comp. Laws of Okla. 1909 is as follows:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

As the Legislature has enacted this law, the courts of this state are without power to do otherwise than to enforce it. The trial court repeatedly, correctly, and fully instructed the jury as to the presumption of innocence and the doctrine of reasonable doubt as applicable to all of the facts and circumstances in evidence before them.

The question here presented has been repeatedly passed upon

by this court adversely to the contention of counsel for appellant. *Hawkins v. U. S.*, 3 Okla. Cr. 651, 108 Pac. 561; *Prince v. U. S.*, 3 Okla. Cr. 700, 109 Pac. 241; *Culpepper v. U. S.*, 4 Okla. Cr. 103, 111 Pac. 679. We cannot do better than quote from the case of *Prince v. United States, supra.* The opinion in this case was by Judge Richardson, than whom Oklahoma has not produced an abler or more conscientious judge. It is as follows:

"If the prosecution proves the killing without showing of facts sufficient to raise a reasonable doubt as to the defendant's justification or excuse, the unlawfulness of the killing is presumed, and thereupon the burden shifts to the defendant to produce sufficient testimony to raise a reasonable doubt as to his justification or excuse. If the defendant discharges this burden, then it returns to the prosecution, and, to warrant a conviction, the prosecution must overcome such reasonable doubt thus raised by proof beyond a reasonable doubt of each essential element of the crime. And where the court gives that statutory provision as an instruction, and also instructs the jury, as he did in this case, that upon the whole case the burden is on the prosecution to prove the defendant's guilt beyond a reasonable doubt; that every presumption of law, independent of evidence, is in favor of innocence; that this defendant is presumed to be innocent of any offense; that this presumption remains with him throughout the trial, and attends him step by step; and that if, upon a consideration of all of the evidence, there remains a reasonable doubt of the defendant's guilt, he must be acquitted—certainly the giving of the instruction complained of thus limited in its application could not be held error. On the contrary, it is proper. *People v. Flahave,* 58 Cal. 249; *People v. Hawes,* 98 Cal. 648, 33 Pac. 791; *People v. Neary,* 104 Cal. 373, 37 Pac. 943; *Duncan v. People,* 134 Ill. 110, 24 N. E. 765; *People v. Tarm Poi,* 86 Cal. 225, 24 Pac. 998; *Bell v. State,* 69 Ga. 752; *Murphy v. People,* 37 Ill. 447; *State v. Tabor,* 95 Mo. 585, 8 S. W. 744; *Territory v. McAndrews,* 3 Mont. 158; *Territory v. Rowand,* 8 Mont. 110, 19 Pac. 595; *State v. Keith,* 9 Nev. 15; *People v. McGonegal,* 62 Hun, 622, 17 N. Y. Supp. 147; *State v. Mazon,* 90 N. C. 676; *State v. Jones,* 98 N. C. 651, 3 S. E. 507; *State v. Thomas,* 98 N. C. 599, 4 S. E. 518, 2 Am. St. Rep. 351; *State v. Byers,* 100 N. C. 512, 6 S. E. 420; *State v. Rollins,* 113 N. C. 722, 18 S. E. 394; *Commonwealth v. Drum,* 58 Pa. 9; *People v. Callaghan,* 4 Utah, 49, 6 Pac. 49; *Cotrell v. Commonwealth,* 17 S. W. 149, 13 Ky. Law Rep. 313; *Peo-*

*ple v. Boling,* 83 Cal. 380, 23 Pac. 421; *Territory v. Manton,* 8 Mont. 95, 19 Pac. 387; *Hammil v. State,* 90 Ala. 577, 8 South. 380."

Section 6857 of Snyder's Compiled Laws of Oklahoma 1909 is as follows:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict, and if it state the testimony of the case, it must in addition inform the jury that they are the exclusive judges of all questions of fact. Either party may present to the court any written charge, and request that it be given. If the court thinks it correct and pertinent, it must be given, if not, it must be refused. Upon each charge presented and given or refused the court must indorse or sign its decision. If part of any written charge be given and part refused the court must distinguish, showing by the indorsement or answer what part of each charge was given and what part refused."

Paragraph 5 of section 6823 of Snyder's Compiled Laws of Oklahoma 1909 is as follows:

"When the evidence is concluded, the attorneys for the prosecution may submit to the court written instructions. If the questions of law involved in the instructions are to be argued, the court shall direct the jury to withdraw during the argument, and after the argument, must settle the instructions, and may give or refuse any instruction asked, or may modify the same as he deems the law to be. Instructions refused shall be marked in writing by the judge, if modified, modification shall be shown in the instruction, and by refusal to give instructions or the modification thereof, shall be deemed to be excepted to. When the instructions are thus settled, the jury, if sent out, shall be recalled and the court shall thereupon read the instructions to the jury."

Construing these two statutes together, it is plain that our law only requires the judge to give to the jury in his instructions such matters of law as he thinks are necessary for their information in giving their verdict, and that the instructions must be settled after the introduction of evidence is concluded, and that, if counsel for the defendant desire any additional instruction given to the jury, it is their duty to reduce such instructions to writing, and request that they be given. See *Boutcher v. State,* 4 Okla. Cr. 585, 112 Pac. 762. We certainly would not be justified in

reversing a conviction where the law is correctly given, and is applicable to the facts of the case. If counsel for appellant had desired, they might have requested the court to instruct the jury as the court did instruct the jury in the case of *Culpepper v. United States, supra;* but, in the absence of such a request, all the instructions given being applicable to the facts of the case and in harmony with the laws of this state, and it not appearing from the entire record that the defendant has been deprived of any substantial right, we cannot grant a new trial upon the ground which we are now considering.

Third. We think that the state's evidence in this case amply sustains the verdict. It is true that there is a great deal of evidence on the part of appellant contradicting the testimony of the state, but it is the province of the jury, and not of the court, to settle conflicts in testimony.

Abe Hunter, a witness for the state, testified as follows:

"Q. I will ask you if, in the city of Perry, on the 2d or 3d day of March—the 3d day of March—on the east side of the square, if you saw the defendant Glick Lumpkin? A. Yes, sir. Q. About what time of day? A. Somewhere along about 4, or something; Somewhere along about 4 or 5 o'clock, something like that. Q. In the afternoon? A. Yes, sir. Q. I will ask you if at that time and that place he made any threats or any statements in connection with the deceased, James Edward Fitzpatrick? A. Yes, sir. Q. Tell the jury what he said. A. Shall I tell how he come to say this? Q. Just state what he said. A. He said that if the Fitzpatrick boys come that night to the dance, that he was going prepared, and, if they come, he was going to get them, 'going to kill them. God damn them.' That is the words. Q. Who did he make that statement to, Mr. Hunter? A. Why, I don't know his name. I don't know the man, in fact, that he was speaking to. There was him and his brother. His brother was with him at that time. Q. Where was the man standing? A. He was standing on the side—he had walked from the north, and they was going east. Q. Where had the man come from? A. About—he had rode up and got off of his horse in front of Smith's office over there. Q. You say that was the afternoon of the evening in which the tragedy occurred? A. Yes, sir. Q. I will ask you if prior to that time, a couple of weeks, or ten days, on the

south side of the square, in the city of Perry, if you was present when the deceased, Fitzpatrick, and his brother John passed by the defendant? A. Yes, sir. Q. Where was it? A. That was somewheres along by Lindemann's or the Famous, I couldn't say. Q. On the south side of the square? A. Yes, sir. Q. Who passed by? A. John Fitzpatrick and Ed. Q. What did the defendant say at that time, if anything, regarding the deceased? A. He said that the—the middle aged Lumpkin boy, Lucius, I suppose is his name, said, 'there goes— Mr. Martin: I object to that. Mr. Doyle: Was the defendant Glick Lumpkin, present? A. Yes, sir. Q. What did he say? A. He says: 'There goes the sons of bitches. We will get them, God damn them.' That's the words he said. Mr. Doyle: That's all."

John Fitzpatrick, a witness for the state and also a brother of the deceased, testified that the deceased and himself attended a dance on the night of the homicide at the home of Mr. Ezzard, in Noble county, Okla., and that, when they reached the scene of the difficulty, they entered the house. He then proceeded to testify as follows:

"A. I went into this room here, where they are dancing, and started to go by the folks that were furnishing the music into this room. Q. Into the south room? A. Yes, sir. Q. Well, did you go into the south room? A. No, sir. I heard a shuffle or rustle, behind me, and I looked back, and I saw Glick Lumpkin kick my brother, or trip him; but he more kicked him than anything else. Q. That is your deceased brother? A. Yes, sir. Q. Now, where was the defendant, Glick Lumpkin, stationed at that time, and what was he doing? A. He was playing the violin right there at the door. Q. You mean this door (indicating on the plat)? A. No; a little further over. Q. This being the kitchen, from the north room, and this being the door of the west room, south? A. Yes, sir. Q. You say he was inside of this door? A. Yes, sir. Q. Then what happened? Tell the jury. A. Then there was a crash, and that crash, to the best of my knowledge, was a shot, and both parties were fighting at once, and there wasn't a word spoke on either side that I ever heard, or knowing anything about; and I hadn't known that my brother was behind me. I didn't pay much attention to him. I thought probably he stopped out in the kitchen to talk to somebody; and so the fight started, and the shooting started as soon as the fight started,

or very near it; and how I know they was fighting I come in this door here, and my brother was not in— Q. Which door? A. In this door, into the south room; and I believe I was fighting Lucius. I don't know whether I was or not for sure right then; but next my brother was apparently down, and he run to me and grabbed hold of me, and, as he did, he was shot from the left, apparently from the left side, by a party standing over there [indicating], and after he was down, in a dying condition, Glick Lumpkin stepped up and shot him again, shot him right through here [indicating]. Q. About how many shots were fired, Fitzpatrick? A. I couldn't say. Q. Approximately? A. I suppose probably seven or eight or a dozen. Q. What was the condition of your brother when you saw him again, as to being dead or alive? A. He was lying dead on the floor."

Lou. Dolman, a witness for the state, testified that, after the shooting was over, he went into the room where the shooting had taken place, and found the deceased lying on the floor. He then proceeded as follows:

"Q. Was he living when you saw him? A. Why, he just looked to me like he was breathing his last, when I was there by him. Q. Did you see the defendant, Glick Lumpkin, about that time? A. Why, I seen him right afterwards. Q. Where was he? A. Well, he come there to the door, where I was standing over Ed. there. Q. Did you hear any remark made by him? A. Yes, sir. Q. What did he say? A. He says, 'Is he dead? God damn him. I want to kill him.'"

Jesse Boright, being introduced on behalf of the defendant, testified that he was marshal of the city of Perry; that on the night of the homicide the defendant came in to the town of Perry, and surrendered himself to the witness, and told him that he, the defendant, had killed a man. The witness further testified as follows:

"A. Well, I asked him where his gun was, when he got out, and he says, 'In the buggy,' and I think I told the boys to dig the guns out, and they got me out two guns and a billy, and I think a fiddle neck, with some strings to it. I left that in the buggy. Q. What other remark did he make about killing Fitzpatrick? A. Well, sir, I says, 'How did you come to two guns?' and he says, 'One of the guns is his. We took it from him, one of the guns.

is his.' And he said something about killing him with his own gun. I don't know which he said."

This witness evidently tried to do all in his power to screen and protect the defendant, and, when pressed on cross-examination, he endeavored to modify his statement that the defendant told him that he, the defendant, had killed the deceased with his own gun. But having been put on the stand by the defendant, who thus vouched for his credibility, and the evident disposition of the witness to do all he could to help the defendant, the jury were fully justified in placing the strongest possible construction upon his testimony adverse to the defendant.

The defendant, Glick Lumpkin, took the stand in his own behalf, and on cross-examination admitted that he carried a pistol with him that night to the place where the homicide occurred, and he further testified that he fired all the shots that were fired during the difficulty which resulted in the death of the deceased. These admissions, in connection with the other evidence in the record, rendered it impossible for the jury to acquit him.

Dr. A. A. Weber, a witness introduced on behalf of the state, testified as follows:

"Q. Just state to the jury, Doctor, the result of that examination, with reference to wounds on the body? A. I found three bullet wounds in the body. Q. Where were they? A. One wound was—had penetrated the sixth rib, about an inch below the nipple, and had passed clear through the body, and had lodged near the outer surface on the other side, about an inch further down than it had gone in. The second bullet entered the sternum, or breastbone, about the level of the second rib, and backward, passed completely through the superior vena cava vein, which is the vein which returns all the blood from the upper part of the body to the heart, and from there passed down through the right oracle of the heart, and down through the thorax into the abdominal cavity. The third bullet wound I found in the head, about two inches above the right ear, and about an inch behind that, and that wound had fractured the skull, broken the bone, and had flattened out, and then slipped backwards about an inch, and lodged just under the scalp on top of the skull. Q. Now, the first wound you talk about, Doctor, went in on which side? A. The

5 Cr.—32

left side. Q. About the sixth rib? A. Yes, sir; right through the sixth rib. Q. And it ranged through the body? A. It ranged right straight through the body, a little downward and a little backward. Q. And lodged in the skin, just under the skin, on the right side? A. I don't know just where it lodged. Dr. Moore got there before I did, and he removed it. It must have been near the surface, however. Q. Now, the second wound, that entered, you say, through the breast-bone? A. Yes, sir; right up here, at the level of the second rib. Q. It went down? A. It went downward and to the right and backward. Q. Downward and to the right, and backward? A. Yes, sir. Q. The other bullet, you say, hit him in the back of the head? A. Yes, sir; in the side of the head. Q. And flattened out? A. Yes, sir. Q. Which one of these wounds, Doctor, in your opinion, caused his death? A. Well, the two body wounds were both undoubtedly fatal. Q. Which, if either, was instantly fatal? A. Well, I don't think— I didn't say instantly fatal; but I think the one that passed down through the sternum was the one most fatal of the two. Q. Doctor, did you observe any bullet holes through his pants? A. Yes; I found one. Q. That hadn't hit the body? A. Yes, sir. Q. Where was that bullet hole. A. It passed right across his right leg, about there [indicating], and through the clothing, but didn't touch the right leg. Q. Passed across his left leg? A. Yes; just cut the clothing, was all. Q. Doctor, was that wound in the head such a wound as in your pinion would render him unconscious, so that he would lose the power of locomotion, and knowing what he was doing? A. Yes; I think undoubtedly that bullet wound would have knocked him down, and knocked him unconscious. There is no doubt about that. Q. What would be a man's actions in that condition, in reference to struggling around, or moving around? A. He would be absolutely quiet. Q. He would be quiet? A. Yes, sir."

Strike from the record every word of evidence on behalf of the state except that of Dr. Weber, which is not denied, and it must be taken as an admitted fact that the deceased was powerless to harm the appellant and was in a defenseless condition when he received the last shot. In connection with this, take the admission of the appellant that he fired all the shots that were fired during the difficulty, and the proof amounts to demonstration that the appellant shot the deceased while he was lying in a helpless condition on the floor, when the glamor of death was in his eyes,

and the rattle of death was in his throat, just as John Fitzpatrick testified that appellant did do. Connect this with the testimony of Jesse Boright, a witness for the appellant, to the effect that the appellant had stated to him that he had killed the deceased with his own pistol, and there is absolutely no rational escape from the conclusion as to the guilt of the appellant. Even if appellant was mistaken in saying that he had killed the deceased with his own pistol, it is clear that appellant knew when he fired this shot he killed an unarmed and defenseless man. Grant that this shot was fired in the heat of passion, before cooling time had intervened, which is the most that could be claimed for appellant, this would make the killing manslaughter in the first degree under our statute. From this standpoint it would be an abortion of justice to grant a new trial in this case. It may be said that the witness Boright testified that the pistol given him by appellant and claimed to be the pistol of the deceased was loaded with unfired cartridges, but it is a significant fact that this witness, though evidently partial to the appellant, did not testify that the pistol had not been recently fired. It must be remembered that appellant traveled several miles from the scene of the difficulty before surrendering to Boright, and there is testimony in the record showing that appellant was seen to reload a pistol soon after killing the deceased. Granting, for the sake of argument, that every word of the testimony which was used against appellant was contradicted, yet it must be remembered that the jury were the sole and exclusive judges of the credibility of the witnesses and the weight of the testimony. There is not one word of complaint in the record or in the brief of appellant indicating that the jury was not entirely fair and impartial. Every man on the jury was acceptable to the appellant, because the record shows that when the jury was impaneled he still had two peremptory challenges which he had not used. By his action in accepting the jurors, he has introduced them to this court and vouches for their fairness, impartiality, and integrity. Being thus recommended by the appellant himself, we are bound to accept their verdict, under our law, as conclusive of the facts in this case. This court is not hunt-

ing for excuses to set aside the verdicts of juries and the judgments of courts, and thereby turn, guilty men loose. We believe that the laws of Oklahoma should be fearlessly and strictly enforced, and it is a waste of time for attorneys to appeal cases to this court and ask for a reversal upon the facts, unless there is absolutely no evidence in the cases appealed from which a jury could legitimately draw the conclusion of the guilt of the defendant. We feel that the appellant has been fairly tried before an impartial jury and by an able judge, who manifestly sympathized with the appellant and who would evidently have been pleased to see him acquitted, if it could have been lawfully done, but who was brave enough and honest enough to enforce the law, even though the conviction of the appellant was contrary to the personal feelings of the judge. We most heartily commend the action of the trial judge in overruling the motion for a new trial upon the ground that the verdict was contrary to the evidence.

We find no material error in the record before us, and the judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, JUDGE, concurs.

McADAMS, SPECIAL JUDGE (dissenting). I regret exceedingly that it becomes necessary for me to dissent from the majority opinion of this court, but, as I view this case, I do not feel that I would be justified under my oath to do otherwise.

There is no other criminal case in this state that I have been able to find similar to the one at bar. Therefore this court is called upon for the first time to determine the power, duty, and responsibility of a trial judge in passing on a motion for a new trial. The trial court in passing on the motion for a new trial (one ground of which was that the verdict was not supported by the evidence) stated, among other things, as disclosed by the record:

"But I must say there are things in this lawsuit that are so very peculiar to me that they are inexplainable. I have no way

to explain them. One other thing—I have heard all this evidence, and I tried to give it my undivided attention, and I believe I did. I believe I understand practically what the evidence in this case discloses, and it is impossible for this court to say that he is convinced beyond a reasonable doubt that the defendant in this case was not justifiable. I must confess that, under all the evidence in this case. That this man was murdered or killed there is no doubt, not the least particle in the world, but not that this man was not justified. That means to say that this evidence in my mind convinces me beyond a reasonable doubt. But, gentlemen, that is not the function of this court. I only wish at this time it was. But it is not. I am simply an individual. If this court can say that he should grant a new trial by reason of the fact that he is not convinced beyond a reasonable doubt of this man's guilt, so far as this self-defense proposition is concerned, I would be establishing an unknown precedent in the law of this land. * * * I can't do that. That is not my function. That is not the purpose of the court. * * * And, as I stated before, there are some peculiar things about this case. The complaining witness does not come to me clothed in that cloak of honesty and uprightness that every complaining witness should present a commission of crime to a jury of his countrymen. And it was an awful thing, a horrible thing, to confine a man in the penitentiary, and take away his liberty, if it is done by evidence that is not true. And I must confess that the evidence of the complaining witness in some particulars does not come to me in the way that it should. * * * One other thing about this case, to say the least of it, and I must state, after a very careful reflection, that undoubtedly it was the main cause of this verdict: Here were guns of the latest manufacture, and of the oldest manufacture, all sorts and kinds of guns, cudgels, knives, slung-shots, and I don't know as all the evidence was introduced, I don't know as I am stating the facts in the case, but the valise containing all this paraphernalia was sitting under me here, where I could see into it, and I discovered knucks and other cudgels and instruments of warfare. * * * That this evidence that this gun came from the Fitzpatrick house, there is some very strong evidence in corroboration of that fact; very strong evidence in corroboration of that fact. But I don't believe, I can't believe, that all the facts in this case have been told. That is exactly the way I feel now. * * * And, as I said before,

it strikes me that that is what brought about, more or less, this verdict that was returned by this jury; and right here there is another thing that militated against this defendant in my opinion, and that is that from the day of the opening this has been a place and rendezvous for crime of that character. All a man had to do was to go before a jury with a plea of self-defense or insanity, or something of that kind, and he was turned loose, turned loose upon our streets to annoy and harass the public. That has something to do with this verdict. We are 14 years old and more. This country is becoming civilized, and this theory of carrying guns and pistols wherever you go, even to social functions, ready for trouble, ready for affray, I tell you, gentlemen, the juries of this country are going to do away with that; absolutely do away with it."

Plaintiff in error contends when the verdict of the jury was challenged by a motion for a new trial, upon the ground that it was contrary to the evidence, that it was the duty of the trial judge to weigh the evidence, and unless he was convinced of the guilt of defendant, and could conscientiously approve the verdict as a just one, he should have sustained the motion and awarded a new trial. And when the record discloses that the trial court was not convinced of the defendant's guilt, and did not conscientiously approve the verdict of the jury, it is the duty of this court to reverse the cause and direct the lower court to grant a new trial.

This brings squarely before us for determination: What is the duty of a trial judge in passing on a motion for a new trial when the verdict of the jury is challenged upon the ground that it is not supported by the evidence? In *People v. Knutte,* 111 Cal. 453, 44 Pac. 166, the Supreme Court of California, in discussing this question, said:

"While it is the exclusive province of the jury to find the facts, it is nevertheless one of the most important requirements of the trial judge to see to it that this function of the jury is intelligently and justly exercised. In this respect, while he cannot competently interfere with or control the jury in passing upon the evidence, he nevertheless exercises a very salutary supervisory power over their verdict. In the exercise of that power, he should always satisfy himself that the evidence as a whole is

sufficient to sustain the verdict found; and, if in his sound judgment it does not, he should unhesitatingly say so, and set the verdict aside."

In considering the question of "reasonable doubt," the court further said:

"Nor does it affect the question that the evidence in the case may have a legal tendency to prove all of the material facts. Guilt is to be established beyond a reasonable doubt; and, while there may be some evidence to support each fact, this does not signify that it is necessarily such as to satisfy the conscience of the judge that a case is made which warrants conviction."

In *People v. Chew Wing Gow*, 120 Cal. 298, 52 Pac. 657, the Supreme Court of California again, opinion by Justice Temple, in discussing the duty of the trial judge to weigh the evidence, said:

"This is one of the most important duties which the trial judge has to perform, and, when no efficient review of his action can be had, it is peculiarly incumbent upon the judge to weigh the evidence with care and conscientiously grant a new trial, when in his opinion the interest of justice requires it. In my opinion there is no more prolific cause of miscarriage of justice than the reluctance of the trial judges to grant new trials in criminal cases."

In *Garton v. Sterne and Others*, 121 Cal. 347, 53 Pac. 904, the Supreme Court of California again said:

"It is the province of the trial judge upon motion for a new trial to inquire into the sufficiency of the evidence upon which a verdict or findings was found, and it is his duty to grant a new trial when, in his judgment, the evidence was insufficient to support the decision. * * * It has been repeatedly held that upon motion for a new trial it is the duty of the trial court to examine the evidence, even though it be conflicting, and, if dissatisfied with the conclusion reached, to grant a new trial."

In *Serles v. Serles and Others* (Supreme Court of Orgeon) 35 Or. 289, 57 Pac. 634, in the body of the opinion the court in passing upon this question said:

"It must be understood, of course, that a mere dissatisfaction of the judge with the verdict is not sufficient ground for disturb-

ing it, but the court must exercise its judgment in each particular case, and if from all the testimony given the jury it is satisfied that the verdict is against the clear weight or preponderance of the evidence, or that the jury has acted unreasonably in returning the verdict, or has been misled or misdirected, or has acted through improper motives, it is the duty of the court to set it aside and grant a new trial. * * * "

In *Kansas City W. W. & N. W. R. Co. v. Ryan,* 49 Kan. 1, 30 Pac. 108, the Supreme Court of Kansas in an opinion by the late Chief Justice Horton said:

"It has been the unvarying decision of this court to permit no verdict to stand unless both the jury and the court trying the cause could within the rules prescribed approve the same. When the judgment of the trial judge tells him the verdict is wrong, whether from mistake or prejudice or other cause, no duty is more imperative than that of setting it aside and remanding the question at issue to another jury. While the case is before the jury for their consideration, the jury are the exclusive judges of all questions of fact; but, when the matter comes before the court on a motion for a new trial, it then becomes the duty of the trial judge to determine whether the verdict is erroneous. He must be controlled by his own judgment, and not by that of the jury. When a trial judge overrules a motion *pro forma,* and declines to look into the facts or pass upon its sufficiency, he misconceives his duty and commits fatal error."

—*Atyeo v. Kelsey,* 13 Kan. 212; *Williams v. Townsend,* 15 Kan. 563; *Railway Co. v. Kunkel,* 17 Kan. 145; *Railway Co. v. Keeler,* 32 Kan. 163, 4 Pac. 143; *Railway Co. v. Dwelle,* 44 Kan. 394, 24 Pac. 500.

"Where a verdict of the jury does not meet the approval of the trial judge, it is his duty to set aside the verdict and grant a new trial." (*Pierson v. Thompson,* 4 Kan. App. 173, 45 Pac. 944; *Richolson, Sheriff, v. Freeman,* 56 Kan. 463, 43 Pac. 772; *Myers v. Knabe et al.,* 4 Kan. App. 484, 46 Pac. 478.) .

Mr. Justice Brewer has laid down what seems to us to be the proper rule for the guidance of the trial judge in *Railway Company v. Kunkel,* 17 Kan. 172, *supra.* He says:

"This one (the trial judge) has the same opportunity as the jury for forming a just estimate of the credence to be placed in

the various witnesses, and, if it appears to him that the jury have found against the weight of the evidence, it is his imperative duty to set the verdict aside. We do not mean that he is to substitute his own judgment in all cases for the judgment of the jury, for it is their province to settle questions of fact, and when the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions thereon, he has no right to disturb the findings of the jury, although his own judgment might incline him the other way. In other words, the finding of the jury is to be upheld by him as against any mere doubts as to its correctness, but when his judgment tells him that it is wrong, that, whether from mistake, or prejudice, or other cause, the jury have erred and found against the fair preponderance of the evidence—then no duty is more imperative than that of setting aside the verdict and remanding the question to another jury."

In *State v. Bridges*, 29 Kan. 138, in an opinion by the late Chief Justice Horton, in passing upon the identical question raised here, he said:

"Even in a civil case, when the judgment of a trial judge tells him that the verdict is wrong, that whether from mistake or prejudice, or other cause, the jury have erred and found against the fair preponderance of the evidence, then no duty is more imperative than that of setting the verdict aside, and remanding the question to another jury. In a criminal case this duty is still more important, and a trial judge ought never to sentence a prisoner upon a verdict which is properly challenged, unless he is willing to declare that the verdict of the jury should be accepted as just."

In *City of Sedan v. Church*, 29 Kan. 190, Justice Valentine, delivering the opinion of the court, said:

"Trial courts are vested with a very large and extended discretion in the granting of new trials, and new trials ought to be granted whenever in the opinion of the trial court the party asking for the new trial has not in all probability obtained or received substantial justice. * * * *"

In *Yarnell v. Kilgore*, 15 Okla. 591, 82 Pac. 990, the Supreme court of the Territory of Oklahoma in an opinion by Burwell, Judge, said:

"The jury in the first instance are the triers of all issues of fact, but when they have passed upon the facts and expressed their views by a verdict, and the sufficiency of the evidence is challenged, then it must be weighed and considered by the trial court, and, unless it is satisfied with the judgment to such an extent that its reason and judgment approve it, a new trial should be granted. The approval of a verdict does not mean merely that informal approval which is inferred from the act of rendering judgment upon it, but it means the assent and approval of the mind, after due consideration; and, when the mind of the court refuses to concur in the correctness of a verdict, and its honest convictions lead it to believe that it ought to have been for the other party, then the verdict is not supported by the evidence so as to merit its approval, for in passing upon a motion for a new trial it is the court, and not the jury, that must weigh and determine the effect of the evidence. It cannot be said that the court approves a verdict when its reason and judgment rebel against the conclusion it expresses. The rule requiring a juror to be satisfied with the verdict is no stronger than the rule which makes it the duty of the trial court to approve or disapprove, as dictated by its own conscience and judgment. It may be here suggested, however, that as one juror may yield his opinions, and accept those of the other jurors, so may the court yield his impressions or opinions, and adopt those of the jury; but such surrendering of his own views must be the result of consideration and reasoning, and can only be done where it through such process finally reaches the conclusion that the verdict is right, and by reason thereof approves it."

In *Hogan et al. v. Bailey,* 27 Okla. 15, 110 Pac. 890, the Supreme Court of Oklahoma, speaking through Chief Justice Dunn, said:

"The trial court has a higher function under our jurisprudence than to act merely as a moderator or umpire between contending adversaries before a jury. Not only is it charged with the duty of seeing that the course and conduct of the trial give to each of the litigants a fair opportunity to present his cause, and to have the facts weighed in the light of proper instructions declaring the law relative thereto, but it is the imperative, abiding duty of the court, after the jury has returned its verdict, and awarded to one of the other success in the controversy, where the

justness of the same is challenged as in this case, to carefully weigh the entire matter, and, unless it is satisfied that the verdict is responsive to the demands of justice, to set the verdict aside and grant a new trial. Not only must the jury be satisfied of the righteousness of the conclusion to which it arrives, but, unless that conclusion meets the affirmative, considerate approval of the mind and conscience of the court, it should not, where challenged, be permitted to stand."

If the verdict of the jury be repugnant to the evidence or the law, does it, notwithstanding it is wrong, bind the trial courts and compel them to give it force and effect and approve it? I think not. To do so would be to take away from the judiciary the power that rightly belongs to it under our system of government. It is eminently proper that the people should make the law by which they are to be governed, but this does not mean that they should interpret, or that they are competent to interpret, it in such a way that justice may prevail. They have realized their inability to do this, and established for that purpose a judicial system. Upon the judiciary depends the destiny of this republic. Therefore its power should not be curtailed so as to prevent it from properly administering the law. The duties and responsibility of a judge should be placed above all others. He is to pass final judgment between the government and the prisoner at the bar, whom that government is prosecuting. The President of the United States, the Governor of a state, may, by virtue of the pardoning power vested in them, remove the punishment inflicted upon an innocent man, but the trial judge, if he be a just judge, holding the scales of justice in his hands, may go further and prevent the sting of conviction and disgrace being placed upon an innocent man and his posterity by seeing that the law is properly administered, and that no verdict be permitted to stand which in his judgment does not meet the ends of justice. It is not the mere suspicion of guilt that justifies a jury in returning a verdict of guilty, or that justifies the court in approving the verdict, but it must be competent and legal evidence, adduced in a legal way, sufficient to satisfy the minds of the jury beyond a

reasonable doubt of the defendant's guilt, and, unless this is done and the trial court conscientiously approves the verdict as a just one, no proper judgment can be entered.

Section 6, art. 2, of the Constitution of this state, provides:

"The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong, and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay or prejudice."

Section 20, art. 2. provides:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed.  *   *   * "

Construing sections 6 and 20 of article 2, *supra,* of our Constitution, together, it must be taken as established by virtue thereof that a party charged with crime has a constitutional right to be tried by a fair and impartial jury of his county, presided over by a competent court, who shall see to it that justice is administered, without sale, denial, delay, or prejudice; that a trial by jury means a right to be tried by a fair and impartial jury upon the charge preferred, or the issues joined in the cause, in the presence and under the superintendence of a judge empowered to instruct them on the law, relative to the issues of fact involved in the case, and to set aside their verdict when, in his opinion, it is contrary to the law or the evidence. Trial by jury does not mean simply a trial before 12 men, duly impaneled and sworn to render a true verdict according to the law and the evidence given them, but means a fair and impartial jury, duly impaneled and sworn according to law, presided over by a competent court, with power and superintending control over them. In a capital case it requires the concurrence of 12 jurors to return a verdict of guilty, but, before judgment can be entered upon the verdict, it requires the concurrence of the thirteenth man, the trial judge, and unless the trial judge can, and does, approve the verdict as a just one, right and justice has not been administered as guaranteed by our Constitution. It is therefore the imperative duty of a trial judge, where the verdict of the jury is challenged by a motion for

a new trial, which contends as one of the grounds therefor that the verdict is contrary to the evidence, to carefully weigh the evidence, and unless he is satisfied in his own mind, and his conscience tells him that the evidence is sufficient to sustain the verdict as a just one, to set it aside and grant a new trial.

The learned judge who wrote the majority opinion holds that the language of the trial judge in acting upon the motion for a new trial constitutes no part of the record, and will not be considered by this court. To this part of the opinion I cannot agree. The language of the trial judge appears in the case-made, which was signed and approved by him, and we must therefore accept this portion of the case-made as absolutely true, and as speaking the exact language of the trial judge in passing upon the motion for a new trial. In *Yarnell v. Kilgore, supra,* which has been specifically approved in recent decisions of our Supreme Court, the language of the trial judge in acting upon the motion for a new trial was incorporated into the case-made and the language of the trial judge was the very point, and only point, upon which the Supreme Court of Oklahoma Territory predicated its judgment of reversal. If the court in a civil case, involving merely rights of property, make the language of the trial judge, acting upon a motion for a new trial, not only a part of the record, but the basis of a judgment of reversal, how can this court, sitting in judgment upon the life and liberty of a citizen, refuse to consider the language of the trial judge, as shown in this case? The learned judge who wrote the majority opinion in passing upon this point says:

"There was no order of the trial judge directing that the remarks made in this case should be incorporated into the record. The entire remarks indicated that the judge was only expressing his private opinion with reference to the case. These remarks were evidently inserted in the record by counsel for appellant, and as the record contains nearly 800 pages, and the trial judge would not have time to read it all over, and see that each statement was correct, and as the case-made was approved by the county attorney, the trial judge was justified in signing and approving it as presented. We do not for one moment believe that the dis-

tinguished judge who presided at this trial ever intended to send these remarks up for review."

What right has this court to presume that the learned trial judge did not intend his remarks to become a part of the record and be considered by this court, when he has certified them to this court? The learned trial judge evidently knew that in *Yarnell v. Kilgore, supra,* the Supreme Court of the territory of Oklahoma had considered the language of the trial judge in passing upon the motion for a new trial as a part of the record, and had predicated its judgment of reversal upon the remarks of the trial judge. I think, instead of assuming that the trial judge did not intend for this court to consider his remarks, we should assume at the time he made the remarks, and at the time he certified them to this court, that he was familiar with the decision of the Supreme Court of the territory of Oklahoma in *Yarnell v. Kilgore, supra,* and the decisions of our Supreme Court in approving the same; that he then intended such remarks to become a part of the record, and that they should be so considered by this court. Section 6951, Snyder's Comp. Laws 1909, in part is as follows:

"A party desiring to have any judgment or order of the district court (superior county court), or county court or a judge thereof, reversed by the Supreme Court (Criminal Court of Appeals), may make a case containing a statement of so much of the proceedings and evidence of other matters in the action as may be necessary to present the errors complained of to the Supreme Court (Criminal Court of Appeals). The case so made, or a copy thereof, shall within thirty days after the judgment or order is entered, be served upon the opposite party, or his attorney, who may, within three days thereafter, suggest amendments thereto in writing, and present the same to the party making the case, or his attorney. The case and amendments shall be submitted to the judge, who shall settle and sign the same and cause it to be attested by the clerk or county judge, and the seal of the court to be thereto attached. It shall then be filed with the papers in the case. Such original case-made shall be filed with the petition in error. The exceptions stated in the case shall have the same effect as if they had been reduced to writing, allowed and signed by the judge at the time they were taken."

It will be seen from this section of our statutes that the party appealing has the right to make the case-made, and incorporate into it so much of the proceedings and evidence, and other matters as may be necessary to present the errors complained of, to this court. The trial court has no right or authority to prevent the party appealing from incorporating anything into the record which actually transpired during the progress of the trial, and which he desires this court to review. Passing upon a motion for a new trial is a part of the proceedings of the trial, and, if the trial judge makes any statement in passing upon the motion for a new trial, and before entering final judgment, which the appellant deems necessary for this court to review, it is right and proper that he should have the same incorporated into the record, and certified to this court.

It is true there is some evidence in this case to justify the verdict. It is also equally true that there is overwhelming evidence to justify the plea of self-defense, and if the writer was to take the cold record as he sees it, and were permitted to pass upon it, he would unhesitatingly say that the defendant was justified. I do not believe, however, that it is the duty of this court, in a case like the one at bar, to search the record to ascertain whether or not it can find sufficient evidence to warrant the verdict, or sustain the theory of the defendant that he was justifiable. In my judgment there is only one question for this court to determine in this case, and that is whether or not the trial judge approved the verdict, and, if he did not approve the verdict, has the defendant had a trial as guaranteed him by the laws and Constitution of this state?

We believe it is apparent to any fair and impartial mind from the statement of the trial judge in this case that he did not approve the verdict. It is also equally apparent that he was conscious of the fact that he was permitting a verdict to stand, which in his judgment was not sustained by sufficient evidence, but was based upon public sentiment and prejudice against a plea of self-defense in homicide cases.

This record clearly discloses to my mind that the judgment

of the lower court has nothing upon which to stand, except the misconception of duty of the trial judge, and to permit it to stand would be a miscarriage of justice, and contrary to the letter and spirit of our Constitution, declaring that right and justice shall be administered without sale, denial, or prejudice.