## JAMES WILSON v. STATE.

No. A-543.   Opinion Filed May 16, 1911.

1.   **APPEAL AND ERROR—Failure to Argue Error—Abandonment.**
Assignments of error not presented in the brief or orally argued
will be deemed abandoned, unless they involve fundamental error.

2.   **APPEAL AND ERROR—Review—Verdict—Sufficiency of Evidence.** This court will only set aside a verdict because it is contrary to the evidence, in a case where the jury have plainly decided against the evidence, or where the verdict is without evidence.

3.   **CONSPIRACY—What Constitutes.** A conspiracy defined generally as a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means.

(Syllabus by the Court.)

*Appeal from District Court, Oklahoma County; Geo. W. Clark,
Judge.*

James Wilson was convicted of the crime of assault with
intent to kill and appeals.   Affirmed.

Plaintiff in error James Wilson was by information charged
jointly with one Shorty Jones and one Emma Prickett with
assault with intent to kill one L. E. Prickett, alleged to have been
committed on the 4th day of May, 1909; said L. E. Prickett being the husband of the defendant Emma Prickett.   The defendant Shorty Jones entered a plea of guilty and was sentenced to
serve a term of ten years in the state penitentiary.   The defendants Wilson and Prickett were jointly tried.   Wilson was found
guilty and the jury assessed his punishment at one year and one
day in the state penitentiary.   The defendant Prickett was acquitted.   Judgment was pronounced and entered in accordance
with the verdict on July 23, 1909, and an appeal was taken by
filing in this court on January 12, 1910, a petition in error and
case-made.

The evidence on the part of the state is substantially as follows:

L. E. Prickett testified as follows:

"I am the husband of Emma Prickett and live at 301 Washington St., Oklahoma City, and had been working for about three months as night watchman for the Conway Company, out by the Belle Isle and University Station in the northwest part of the city. On the night of May 4th the last thing I did was to go down ·and head off an automobile from going down on the green concrete by the station there, and I set a lamp there and went back to where another man was watching and stayed there a little bit, and then I went back to where I worked and looked around and saw nothing wrong. I took off my shoes, laid down and covered myself with an overcoat and went to sleep. I had one dollar and fifty-six cents in change in my pocket. There was a couple of axes used there around the plant. I went to bed about 12 o'clock. The last person I saw was the night watchman. I don't know what his name is. The next thing I remember I was in St. Anthony's Hospital, several days afterwards. I didn't know I was badly hurt until they told me. (Witness identifies an axe as like one he has seen out there where he worked.) I never had any trouble with Jim Wilson. Had had a few words with Shorty Jones a few days before. The trouble arose over Shorty bringing a woman out to the house to dinner. I told Shorty that I wanted him to quit, but he said he had his board paid until Saturday night and wouldn't quit until my wife told him to, but not until then. That was on Thursday before this attack on Tuesday. I told my wife I wished she would make him quit and she said: 'We need the money and he is paid up, and it will all blow over in a day or two.' "

On cross-examination, he stated:

"We were married in Richland county, Illinois; our relationship was always pleasant; we have two children; I have nothing against my wife. I had $55.00 in bills with me that night that I had placed back in the cement pile under a tarpaulin, I don't know what became of it; I never recovered it. I always carried money that way unless I thought I had enough to bank. My wife and some of the boys seen me have money in my pocket; seen me change bills or something like that."

Dr. M. Smith testified that he was a practicing physician,

called to St. Anthony's Hospital to attend L. E. Prickett. He was suffering from a fractured skull; a fracture through the bottom part of the skull where it joints on the neckbone; he was bleeding at the ears and nose and also had an extensive fracture on the left side of the head; these fractures were from an inch and a half to three inches wide, all depressed and pressed down on the brain. There were two distinct abrasions of the scalp. These wounds were caused seemingly by a severe direct blow of some blunt instrument. The wounds could have been inflicted with the side or back of an axe. Witness examines an axe and says that there are some spots upon it that look like blood.

Ed. Barnes testified that his age was nineteen—

"worked as a motorman for the street railway company; was living with the Pricketts in May, 1909; the other boarders there were Shorty Jones and John and Jim Wilson; I had known Jim Wilson since about Christmas, 1908; was at the Wilson house on May 4th, 1909, the biggest part of the day; there are four rooms in the house; I would generally get home about one o'clock at night; on the morning of May 5, 1909, I went to bed about one o'clock; was awakened about an hour afterwards by Shorty Jones; he called Jim Wilson into my room; he told us he had knocked Prickett in the head with an axe; he said he had put Prickett out of business and reached and caught Jim Wilson's hand and told him how he done it; they shook hands; Shorty said he went out about 10 o'clock, but Prickett hadn't gone to sleep, and he laid down and waited until he went to sleep; he said he had a gun and intended to shoot him, but he saw he wasn't asleep, and then he got the axe and hit him four or five times and went through his pockets and then unlocked the tool box but didn't find any money so he came on home. I saw that Shorty's shoes had something red on them, he said he would have to burn them; he put them in the heater in the Wilson boys' room; he also said his pants had blood on them and he would have to burn them up; he said he hated to burn them and Jim Wilson told him to go ahead and burn the pants and he would get him a new pair. Wilson was in his night clothes. Shorty asked Jim if he had any whisky, and he said 'no.' After Wilson and Shorty got through talking, I think Wilson went into Mrs. Prickett's room; I never seen him go in there, but I heard him walking and heard some talking in there afterwards. John Wilson didn't get up that I know of; I didn't sleep much that night; I dozed off about daylight; I got up about seven o'clock.

When I got up Mrs. Prickett, Jim Wilson, and Shorty Jones were all talking together; I don't know what they were talking about; Shorty said we wanted to keep quiet about what he had done the night before; Jim and Mrs. Prickett were present at that time. Mrs. Prickett said she was going to swear that Jones was in by 9 o'clock the night before. I saw Shorty had the pants that morning rolled up and going toward the kitchen; I didn't see him put them in the stove. Word was not received at the house until about 10 o'clock next morning; Mrs. Prickett wondered why she hadn't got word about him. I had seen the trouble between Shorty Jones and Mr. Prickett. Shorty had brought a woman there for dinner and Mr. Prickett claimed she was not decent and asked Shorty about it. Jim and John Wilson and Mrs. Prickett were also present at that time. I have observed the relations of Mrs. Prickett and Jim Wilson. Have seen them in bed together as many as twenty times when I would come home at night. (Witness identifies two letters as in the handwriting of Mrs. Prickett, and said that Jim Wilson had shown him one of these letters and said that Mrs. Prickett wrote it. Witness also identifies two envelopes as having been addressed by Mrs. Prickett on the first morning or second morning after Prickett was hurt.) The Wilson boys had a trunk in their room; I was at the house when the officers were there; they found these letters, in the trunk; the two letters that were recently addressed were on the dresser in Mrs. Prickett's room."

John Hubatka, chief of police, testified that he arrested the two Wilson boys and Shorty Jones and Mrs. Prickett; searched the Prickett residence the second day after the assault; found some letters, a pair of shoes, and two revolvers in the trunk; the letters and revolvers were found in a trunk that Mrs. Prickett said belonged to the Wilson boys; the envelopes were found on the dresser; witness identifies letter, and also shoes. "Mr. Witcher and I examined the cook stove the following morning; we found some buckles of pants and some remnants of partly burned cloth."

The letters found by this witness in defendant Wilson's trunk were identified by the witness Barnes as having been written by defendant Emma Prickett and having been shown him by defendant Wilson. One of the letters reads as follows:

"Exhibit 'C'.

The world is round & the sea is salt & if you don't get me it won't be my fault.          Yours,          ——————

(Above words enclosed in design of a human heart.)

"My Dear Intended:

"Dearest of all friends:  With pleasure will try and answer those loving words. If you could only read my thoughts, I wouldn't have to write. Pardon me dear if I hurt your feelings. I hope I was mistaken any way.  Oh! love, if I could only be a thousand miles away now & you not far behind I would certainly be happy this evening.  You spoke of me doubting you.  Certainly no one could put much more confidence in any one than I in you.  You are all in all to me,  You know I love you.  No word can express my thoughts toward you.  Actions speak louder than words.  If I didn't think of you as I do I would never trust you as I do now.

"I wish old Shorty would ring off he makes me tired if we want him we will invite him to assist us.  Oh Gee! Sweet Heart I am crazy.  I can go to the door & look out & see you my heart nearly stops. I say to myself God bless his sweet life.  I would rather tell this to you as to write it excuse scribbling.  Pardon me for being so silly. I remain as ever Your Wife. Bye Bye S. H. All the kisses and hugs to hearts content."

W. D. Witcher, deputy sheriff, testified in substance the same as the witness Hubatka.

Webb Jones testified:

"I went out to the place where Prickett was assaulted about noon of May 5th.  Examined the place; there was quite a pool of blood there.  The axe was found near there; it was handed to to me while I was there.  After I had looked the ground over I went and had a talk with Mrs. Prickett, and she said there had never been any trouble between her husband and herself or between her husband and any one else that she knew of."

D. Pitts testified as follows:

"Boarded with Pricketts from January until last of April, 1909.  Jim Wilson, John Wilson, Shorty Jones, Ed Stahl and Shorty Hammon boarded there while I did.  While I was there I saw Mrs. Prickett sitting on Jim Wilson's lap a couple of times. I had a talk with Jim Wilson about it in April.  He came to my room one night about 10 o'clock, and asked me what kind of a bunch I was trying to hand him, and I told him to come in

and I would talk to him, and he came in, and that was after I had seen him and Mrs. Prickett that morning, and I told him I wasn't trying to hand him any kind of a bunch, that I didn't think it was right for him to try to break up a man's home. A couple of days after that when I went to breakfast one morning Mrs. Prickett said she would rather I would get another place to board, that I got her up too early for breakfast, and I quit. On the last election day Mr. Prickett was drinking a little and Mrs. Prickett was mad, and I asked her what the matter was, and Shorty spoke up and said there was nothing the matter, and she turned around and said, 'Damned if she would live with him.'"

On the part of the defense, the records of the court were offered and introduced to show that codefendant Shorty Jones had pleaded guilty to the offense charged in the information. Several witnesses testified as to seeing Jones and Barnes together on the afternoon preceding the assault. Two or three character witnesses testified.

The defendant Wilson took the stand in his own behalf and testified that he had been boarding at Prickett's since about the first of the year. He denied ever having seen the letters found in his trunk marked exhibits "C" and "D", or of ever having received them; that he had ever received any letter from Mrs. Prickett; that he was never in bed with Mrs. Prickett nor did she ever sit on his lap. That there was never any intimate relations between them; that he had no trouble with Mr. Prickett; never had any understanding or arrangements with anybody to hurt or assault Prickett; the first information that he had that Prickett had been assaulted was when Shorty Jones came in that night; when Shorty came in that night he told Barnes what he had done; that he didn't take part in the conversation. Shorty called him in there; that he never told him he would buy him a new pair of pants; that if Mrs. Prickett said that she would swear that Shorty came in the night before at 9 o'clock he never heard it; he saw Shorty with his trousers the next morning and he said he was going to burn them; that was between 6:30 and 7 o'clock; that he generally kept his trunk unlocked. He saw

Shorty Jones and Ed Barnes go out on the porch and talk the next morning.

On cross-examination he stated:

"One of the guns in the trunk was mine and one was my brother's; I was a good friend of Mr. Prickett; I didn't tell Mrs. Prickett of this plot between Jones and Barnes because I didn't consider it my business; I didn't know what it might be; I never noticed Jones' condition that night when he came in; there was no conversation in my room that night by Jones before he went into Barnes' room. John Wilson never came into the room; he never got out of bed. The first thing Shorty said to me was that he had fixed Prickett; I didn't say anything; I didn't know what to say; I didn't notify the officers because it wasn't up to me to do it; before that time I had been working for the C. O. D. Feed Store, doing general work and clerking. I had hauled coal for them; I never told Mrs. Prickett I had burned those letters. I never knew they were in my trunk."

*Taylor, Pruiett & Sniggs* (*E. G. McAdams*, of counsel), for plaintiff in error.

*Chas. West*, Atty. Gen., and *Smith C. Matson*, Asst. Atty. Gen., for the State.

DOYLE, JUDGE. Of the various assignments of error alleged in the petition, the first is the only one presented in the brief. We therefore assume that the other assignments are abandoned. "Assignments of error not presented in the brief or orally argued will be deemed abandoned." *Rea v. State*, 3 Okla. Cr. 281; *Lightle v. State*, 2 Okla. Cr. 334; *Banks v. State*, 2 Okla. Cr. 339.

Counsel for plaintiff in error contend that: "The verdict is not supported by the evidence and is contrary to law."

Section 2045, Snyder's Sts., provides:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

While the statute makes an accessory before the fact a principal, yet the evidentiary facts by which such accessory is to

be incriminated may materially differ from those which are necessary and sufficient to convict the actual perpetrator of the crime. In this case, to incriminate the plaintiff in error, his codefendant Shorty Jones having entered a plea of guilty, proof of the commission of the crime charged having been made, it was only necessary for the evidence to show that plaintiff in error aided and abetted his codefendant Jones in the commission thereof.

Upon a careful reading of the evidence in this case, there can be no doubt but that the verdict of the jury is abundantly supported, if they believed the evidence given on the part of the state. That the jury did believe the evidence on the part of the state is clearly established by the fact that they found this defendant guilty. This court has guarded with jealous care the province of the jury in criminal cases and has often declared its aversion to interference with verdicts.

"Where there is any evidence in the record from which the jury could legitimately draw the conclusion of guilt a conviction will not be set aside upon the ground that the verdict is not supported by the evidence." (*Lumpkin v. State,* 5 Okla. Cr. 489; *Bennefield v. U. S.,* 2 Okla. Cr. 44; *Fuller v. Territory,* 2 Okla. Cr. 86; *Hendrix v. United States,* 2 Okla. Cr. 240; *Cox v. Territory,* 2 Okla. Cr. 663; *Slack v. State,* 2 Okla. Cr. 697; *Caples v. State,* 3 Okla. Cr. 621; *Rhea v. State,* 3 Okla. Cr. 281; *Beasley v. State,* 3 Okla. Cr. 699.)

"Under our system of jurisprudence, it is the exclusive province of the jury to determine whether the evidence tending to prove the guilt of the defendant is so lacking in convincing force as to leave an intelligent and discriminating mind to doubt as to the truth of the charge contained in the indictment, and in reviewing questions of fact upon appeal to the Criminal Court of Appeals, if there is a fair conflict in the evidence, or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion or prejudice." (*Ingram v. State,* 3 Okla. Cr. 634, 108 Pac. 552.)

Section 528 of the Code of Criminal Procedure of the State of New York authorizes the Court of Appeals, when the judgment is of death, to order a new trial, "if it be satisfied that the

verdict was against the weight of evidence, or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below." In the case of *People v. Fish*, 8 N. Y. Cr. 129, the Court of Appeals said:

"This section has been under consideration in this court several times (*People v. Driscoll*, 107 N. Y. 417; *People v. Cignarale*, 110 N. Y. 23; 6 N. Y. Crim. Rep. 62; *People v. Lyons*, 110 N. Y. 618; 6 N. Y. Crim. Rep. 105; *People v. Kelly*, 113 N. Y. 647; 7 N. Y. Crim. Rep. 40; *People v. Stone*, 117 N. Y. 450; 7 N. Y. Crim. Rep. 480). It does not confer upon the court power arbitrarily to grant a new trial whenever it thinks justice may require it, but its jurisdiction in such a case is to be exercised according to settled rules of law. If there is a conflict in the evidence, or different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence, and determine the facts; and their determination should not be interfered with unless we can see that their determination was against the clear weight of the evidence, or was influenced in some way by passion, prejudice, mistake, perversion, or corruption."

In the case of *People v. Cignarale* (*supra*), Andrews, J., said:

"It is a cardinal principle in our jurisprudence that the jury is the ultimate tribunal for the investigation and determination of questions of fact. It is no more the province of an appellate court than of the court of original instance to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate function of the jury, and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse or opposing inferences."

This court will only set aside a verdict because it is contrary to the evidence, in a case where the jury have plainly decided against the evidence, or where the verdict is without evidence.

Counsel in their brief say there is not one scintilla of evidence in the record tending to show that there was ever any suspicion of a conspiracy between plaintiff in error and his co-defendants. Upon his own testimony plaintiff in error was guilty as an accessory under the statute. Section 2046, Snyder's Sts., provides:

5 Cr.—42.

"All persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony, and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories."

A conspiracy may be defined, generally, as a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.

"It is not necessary that the prosecution establish beyond peradventure that the acts, declarations, or conduct of the alleged conspirators were based upon the conspiracy or in reference to the crime charged. It is sufficient if they harmonize with and tend to confirm the charge of conspiracy or show motive for the crime." (*Starr v. State,* 5 Okla. Cr. 441,)

"In cases of crimes perpetrated by several persons, when once the conspiracy or combination is established, the act or declaration of one conspirator, or accomplice in the prosecution of the enterprise, is considered the act or declaration of all, and therefore imputable to all. All are deemed to assent to, or command, what is said or done by any one in furtherance of the common object. A foundation, however, must first be laid *aliunde,* by proof sufficient, in the opinion of the court, to establish *prima facie* the fact of conspiracy between the parties; the question of such conspiracy being ultimately for the jury." (Wharton's Cr. Ev. [9th Ed.] sec. 698.)

"The least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all." (*State v. Anderson,* 92 N. C. 747.)

A conspiracy may be and is usually shown inductively from circumstances. The incriminating circumstances which the evidence on the part of the state tends to prove was the defendant Wilson's criminal relations with his codefendant, the wife of Prickett. This would certainly establish motive, and the evident design of the defendant and Mrs. Prickett, for this reason, to get Mr. Prickett out of the way. Their common purpose is evidenced by her letters to this defendant. The letters disclose a common design as directly indicated by the expression in one letter: "I wish old Shorty would ring off; he makes me tired; if we want him we will invite him to assist us." Letters written

in prosecution of the common design, even if not delivered, are admissible.    However, one of the letters evidently is in answer to a letter from the defendant.    Also the fact that Mrs. Prickett harbored Shorty Jones against the objections of her husband after her husband tried to drive Jones away.    It would also seem that Shorty Jones relied on this understanding, and after committing the crime immediately returned to the home of his victim and disclosed the particulars of the crime to the defendant Wilson, who thereupon proposed to assist him in concealing evidence of the crime.   Wilson then in his night clothes went to Mrs. Prickett's room and talked with her.    The fact that the three defendants held a consultation the following morning and Mrs. Prickett as a part of the conversation was heard to say that she would swear that Shorty Jones came home at nine o'clock the night before, and Shorty Jones said, "We want to keep quiet about what I have done."

There are numerous other circumstances disclosing the common purpose and design to get rid of Prickett and defendant's connection with the crime that cannot be explained consistent with his innocence or the innocence of Mrs. Prickett, and while the jury by their verdict acquitted Mrs. Prickett, that was their peculiar province.   We cannot tell what considerations enter into a verdict returned by a jury where a woman is on trial.    All natural impulses tend to favor her; here, perhaps, more for the purpose of protecting her children of tender years from disgrace. Nevertheless, if the jury made a mistake as to her, that is no reason why this defendant should not suffer the just penalty of the law.

We see no error in the record, and believing the accused had a fair and impartial trial, and that this verdict was in accordance with the evidence, the judgment of the court below is hereby affirmed.

FURMAN, PRESIDING JUDGE, and ARMSTRONG, JUDGE, concur.