## TOM WALDREP v. STATE.

No. A-9961.   July 1, 1942.

(127 P. 2d 860.)

Van H. Albertson, of Shawnee, and Hal Johnson and Glen O. Morris, both of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis R. Morris, Co. Atty., and Phil E. Daugherty, Asst. Co. Atty., both of Oklahoma City, for defendant in error.

JONES, J. The defendant, Tom Waldrep, was charged jointly by grand jury indictment with Joe H. Smalley, in Oklahoma county, with the crime of violating section 2474, O. S. 1931, 21 O. S. 1941 § 274, selling appointments to office. Said cause was transferred from the district court to the court of common pleas of Oklahoma county, a severance was had, defendant was tried, convicted, and sentenced to serve one year in the county jail, to pay a fine of $1,000, and has appealed.

The defendant was, at the time of the offense charged, a State Senator of Oklahoma. His term of office had about three and one-half more years to run. Joe H. Smalley and L. V. Beaman were ex-members of the lower

house of the Oklahoma Legislature. All three of these men had been long-time personal and political friends.

Coy Smith was an 18-year-old boy who, with h i s father, T. J. Smith, were citizens of Arkansas. Coy Smith was married to a daughter of L. V. Beaman.

Chester Leonard, Shannon Leonard, Mastin Thomason and Ernest Casto were also residents of Arkansas. Si Miller resided at Peckham, Okla.

The above-named persons were the principal actors in the drama revealed by the record, which resulted in the conviction of defendant.

Both Beaman and Smalley. spent a good deal of time at the State Capitol building, and directed most of their activities from the office of Department of Mines, where they were on friendly terms with one James Ballard, who had a job in that office.

Mr. Beaman testified:

"Q. (By Lewis Morris, County Attorney) Now, coming down to this case, did you meet Joe Smalley there at the Capitol building and have any conversation with reference to jobs? A. Here is how that started: I was in the Department of Mines. I think I made a remark that they were besieging me for jobs and didn't know I was out of politics, and I couldn't help them, and I think he made the remark that if I had those people, or those people was coming to me, he might be able to help place some of those people. I asked him the agreement of placing them, and he said Senator Waldrep had some appointments and he probably could persuade the Senator to help him make these appointments, or get the appointments for me. Q. What else was said? A. Relative to prices? Q. Yes, that's what we are trying? A. $350."

The testimony further reveals that before leaving the conference a schedule of job selling prices was agreed upon: $100 per month job would cost $350; $125 per month, up to $500. These jobs were to be promised with

442

a tenure of three and one-half years, during the balance of the senatorial term of defendant Waldrep. Beaman went to Arkansas and contacted in a short time the above-named prospects for jobs. He testified to coming back to the Capitol building with T. J. Smith and one Howard White, another job seeking man. On the fifth floor of the Capitol building they sold Coy Smith a job for $350, and sold Howard White one for $500. T. J. Smith paid the money for Coy's job; Beaman got $75 of this money and Smalley was given the balance; this money being paid over in the corridor of the Capitol while T. J. Smith, Beaman and Smalley were together. The evidence shows the money paid in May, 1937, for a Highway Department job, which was to last while defendnat was Senator. That Coy got a job that paid $100 per month, whereas he was promised $150 per month. In December, 1937, or January, 1938, Coy lost his job; that witness Beaman saw Waldrep regarding this loss of job; that he told Waldrep he had brought Coy down here, felt responsible, and would appreciate his getting the boy back. Waldrep stated he would do his best. Coy got another job with the state, but was wanting the $450 back he had paid. That Waldrep later gave Coy Smith one check for $150 and one for $212. Beaman testified that he paid Waldrep the $75 that he had received as his part of the sale price from Coy; Waldrep's two checks proved to be "hot."

T. J. Smith testified that he and Coy were residents of Arkansas; Coy was in love with Beaman's daughter; wanted a job so he could marry her; later did marry her. That Beaman came to Smith's garage in Mayesville, Ark., and "asked me did I reckon Coy would be interested in a good job." That he answered and said Coy was about to quit school, and would like a good job; Beaman offered job in Oklahoma City on state pay rolls. "Beaman spoke

of me 'buying a horse,' and said if I got in on it that it would cost me money, and explained that the 'horse' meant a job on Oklahoma state pay rolls." Smith told Beaman he didn't have $350, but Beaman came back "every day or two until I kinder got interested." Smith says he urged Coy to take a job as offered by Beaman. Then he assured Beaman he could raise the cash, and Beaman said the job would last three and one-half years, and was to pay $125 per month. About May 1, 1937, T. J. Smith went to Oklahoma City on this job buying deal and Howard White went with him. White "bought a horse" in the form of a $500 job at the Capitol. T. J. Smith describes his experiences when he got to Oklahoma City; says he and Beaman went to the Mines office in the Capitol, and there found one Jim Ballard and Smalley. Smalley was introduced to witness. The money question came up and Smalley "guaranteed the job" after Smith assured him he had the cash with him to pay off. First of next month Coy Smith got his job and went to work in the Highway Department. That both Beaman and Smalley told him, "they worked through the Senator," but did not name him at that time.

It was developed in his testimony that this Senator was defendant, Tom Waldrep. Smith was suspicious, and before paying out his $350 said he wanted to see this man Waldrep personally; that Smalley made a phone call. All of the foregoing took place in the Capitol; that Smalley reported he could not get to see the Senator that day, but "By G—, we will guarantee the work, you just go ahead and fix things up." So, Smith testified: "I paid them the money. Evidently the salesmen were nervous; out in the corridor steps Beaman; we walked like we was going down the steps, outside of the office, but right on the bannister Mr. Beaman says, 'You got it?' I says,

'Yes, I got it.' Close at hand stood Joe Smalley. I handed them the money, and they counted it and if I am not awfully mistaken they both counted it right out on the bannister there and said, 'By G—, it's there.' " The "horse" had been sold. Smith concludes his testimony with the remark, "They had about all it looked like, that they wanted off of me. I went back home that day."

Then T. J. Smith relates meeting with defendant at his office in Shawnee after Coy lost his job. He and Coy went to see defendant to get their money back. They had to wait some time, as the Senator was busy in his private office, but after awhile "we went into the office and he asked how we was; and Coy introduced me, and we talked a little bit, and I just asked Mr. Waldrep was there any way he could help us get Coy's money if he couldn't put him to work." The Senator said, "You bet we will work it out." Defendant told them he was expecting Joe Smalley any minute at the office. Smalley came and they talked, but no money was paid back, but he told the Smiths that in just a few days it would be fixed up and Coy would get another job. Smalley and Waldrep went into the private office, where the Smiths could not hear and held a conference; then, "Waldrep sent Smalley out to talk to us." That Smalley came out of Waldrep's private office and told them everything would be fixed.

Coy Smith's testimony corroborates that of his father, with added details. Beaman was his father-in-law; knows defendant Waldrep. Got a job with State Highway Department as chain man in surveying crew; worked at Seminole and Holdenville on this job. Began work June 14, 1937; held this job until December, 1937, or January, 1938; got $100 per month. Was out of a job from January until March, 1938, then was hired by Oklahoma Welfare

Board. Waited in Oklahoma City two weeks before being placed in first job. He testified: "Well, I was campaigning, I guess, on the Welfare job, which paid $175 per month for salary and traveling expenses." Met defendant Waldrep during the time he was out of a job, between the two jobs. "I went and told Mr. Waldrep that I would like for him to get me a job or help me get my money or pay me my money back. He said he believed he could get another job and get it threshed out right away." Smalley came into Waldrep's office before he got to talk to Waldrep very much. This was at Shawnee after he lost the first job. Smalley there said, "Everything was working out all right and would be all right." Waldrep told him and his father when they first went to the office that Smalley would be there in a short time. Soon he came. Heard his father tell Waldrep something about going to school and said give me my money back and I would go to school. They got no money that trip, but "After that I went to see him (Waldrep) several times; went once to see him with Mastin Thomason at Shawnee. That time I told Waldrep it looked like I wasn't going to get any job, and would like to have my money. I was tried of waiting. He said he just didn't have it and couldn't get it." Nothing was said about how much money witness wanted back, but on that trip Waldrep gave Coy Smith and Mastin Thomason each $50 in cash. Witness had bought a car and a payment was due, and he told Waldrep he needed the money. Waldrep just made him out a check for $32. Coy told Waldrep about the car payment being due and that he had been put off his job. "He just asked me how much it was, I don't remember what I told him, but he gave me the check." This was a draft for $32, dated February 2, 1938, payable to Coy Smith, drawn on American National Bank of Shawnee, Oklahoma, signed Tom C. Waldrep. Wit-

ness cashed the draft and it was dishonored and witness had to take it up. Testified he lost his job the day of the primary election, July 12, 1938; then again visited Waldrep at Shawnee. This was his second job and it ended in five months as above set forth. Also saw Waldrep at the Capitol on another occasion. "Told him that it blew up again, and I believed I ought to have my money. The Senator said, 'Well, it looks like it.' " Did not ask what money witness had in mind that he wanted paid back to him. Waldrep gave him $5 that time; "One time or another and sometimes in two or three days he would give me $5, or $10, or something, to pay my expenses while I was waiting on him to see if he could raise the money." Took it for granted that Waldrep knew all about the job sale and drew these conclusions from all the surrounding circumstances.

The state introduced Exhibit No. 3, which was a check for $150, drawn in favor of Coy Smith, dated September 22, 1938, and signed by Tom C. Waldrep. Concerning this check, witness Coy Smith said that he got this check from Waldrep; that it was "supposed to be my money back." Exhibit No. 4 was another check for $212, drawn in favor of Coy Smith, signed by Waldrep, and which made in all $362. Witness swore: "Let's see; that would be $362. I went down to his office at Shawnee and asked him if I couldn't get my money or get the money I paid for the job. I didn't know for certain he got the money, but he never denied it, and he wanted to know how much it was. I says, well, it is $350, is what I paid; and I believe he said $12 would pay my expenses out there and back that trip; and the reason for two checks, you want to know? He said, send one of them through (both dated the same day) I forget which one, when I got home and he said it would go through; and he said in about a week or ten days send the other and

it would go." Witness testified both checks were "hot" though he sent them both through the bank as directed.

Then Coy Smith visited Waldrep again. Went, he doesn't know how many times, caught the Senator at the Capitol, showed him the bad checks, asked him to make them good. He would make excuses by saying he didn't have the money; "would have the money at 10 o'clock in the morning; or by 3 o'clock in the afternoon; or by 5 o'clock; or something like that."

When the grand jury was in session in January, 1939, the two bad checks were paid; paid while in county attorney's hands. Witness says he doesn't know who paid them; wasn't there when they were paid, but he "Got his money after he appeared before the grand jury." In practically all details Coy Smith corroborates his father.

Under the theory of "Other offenses evidence," for the purpose of establishing a motive, intent and a common scheme or plan, the state introduced Mastin Thomason, Shannon Leonard, Chester Leonard, and Ernest Casto as witnesses. All definitely established such common plan or scheme of operation in sale of offices. In fact, the similarity in each case was nothing less than a masterpiece of its kind.

Mastin Thomason testified that he was a citizen of Arkansas, got a job with Oklahoma Tax Commission; got it through paying $500 to Beaman and Smalley; was contacted by Beaman in Arkansas about June, 1937. Beaman asked him if he wanted to "buy a horse." Explained that a "horse" was a job in Oklahoma state offices. Witness came to Oklahoma City, met Smalley and Beaman at Capitol; picked out a Tax Commission job at $150 a month and he was told by them that it would cost $500. June 9, 1937, witness got a letter through the hands of Joe Smalley on a Senate letterhead, dated June 9, 1937,

signed by Tom Waldrep, addressed to Thomason which said: "Your job is before the Tax Commission. I am assured the transfer will be made and that you will be put to work between this and the first of the month, probably on the 15th. You may be assured of this matter working out."

He paid the $500 to Joe Smalley that same day. Later lost job and received checks from Waldrep to appease him which were turned down because of insufficient funds. Corroborates Coy Smith on trip to Shawnee.

The testimony of Shannon Leonard and of Chester Leonard reveals the same sordid story; dealings with same salesmen, Smalley and Beaman; paying for jobs, money passing. Shannon Leonard said, "I paid him $400 downstairs in the toilet." He further stated that Smalley and Beaman paid him back. Witness visited Waldrep several times after job did not pan out as guaranteed. Reference was made to the Senator by Beaman but he didn't say what Senator, so witness Shannon Leonard did a little investigating. "Finally I went to see Senator Waldrep because of the fact that Beaman always would go there and so I decided I would go over there." Shannon Leonard found out that Beaman had contacted Waldrep and saw him. "Then one day I went over and told him (Waldrep) that I would like to have my money back." Got hot check for $150 from Waldrep on November 3, 1937. Check given by Waldrep at his office in Shawnee; that Ernest Casto was present. Shannon Leonard and Casto went together from Oklahoma City; that Beaman repaid some of the purchase price paid for the job, and Waldrep did his part with a hot check for $150.

Chester Leonard tells a rather dramatic story. He bought a job; was an Arkansas citizen; met Beaman at a lawsuit in Arkansas. "Beaman came around and took

me into his confidence and said I believe you are smart enough to hold a good job, and patted me on the back, and said he thought if I could raise $500 he would get me a good job." It was to be an Oklahoma state job at the Capitol. Gave Beaman $100 in Arkansas; Beaman brought him to Oklahoma City; met Senator Waldrep before he got this job. Beaman introduced him to Waldrep about noon, the day he got the job. Been to work 30 minutes when "Beaman runs in there and gets around a corner and motioned for me, and so I figured I better get up and go talk to him, and I got up and walked out, and he said, 'You got that old filthy lucre with you?' I said, yes, sir. 'Well,' he said, 'you better give it to me,' and I said all right and so we went into the men's toilet and I give the money to Roy Beaman." He gave Beaman $400, balance on $500 job of which $100 had been paid in Arkansas. Lost job; saw Waldrep, who paid him most of the $500 back; paid him $400 in currency. Had big fuss with Waldrep at his office. Senator said in reply to request that he pay off, "You can't get blood out of a turnip. Rather than have any trouble," he said, after being threatened by witness, "I will pay you back, but by G— I didn't get it—If you don't cause any trouble, I don't want any scandal." He or his office girl paid witness something like $100.

Ernest "Nig" Casto told a similar story. Contacted by Beaman; bought job on Oklahoma government pay roll; held a farm sale and raised $1,200, out of which he paid $75 down in Arkansas, balance of $425 to Beaman and Smalley in a toilet at the Capitol building; never got the job; interviewed defendant Waldrep and got same stand-off as the others. Waldrep in his law office paid Casto $90 cash and wrote him a check for $410 which, like the others, came back "hot." Smalley later came and

paid off the check, taking it away with him. His testimony in the main corroborates all the other state witnesses as to job selling by Smalley, Beaman, and Waldrep.

Tom Waldrep testified in his own behalf. He admitted under oath the story of Coy Smith and T. J. Smith, in so far as it relates to their visits to him. Admits their demands that they be given their money back or get a job. In short, he admits practically every detail of their testimony relative to him, except wherein it is incriminating. He explains his connection with the employing of Coy Smith as follows:

"Well, now, as I remember it, Mr. Beaman had been after me several times about placing his intended son-in-law, and I told him I would help him. Met Mr. Commons, discussed subject of job for Coy Smith. He said Beaman had already discussed it with him, and that he felt very favorable to the boy because of his friendship for Beaman, and the section Coy came from; told him I'd appreciate very much if he could help Coy; may have talked to him again. Been so long, can't remember conversation. Told Commons that if Beaman talked to him again I wished he would suggest to him I had talked to him about Coy."

He testified that the first time he ever saw Coy Smith was "when he and his father came down to Shawnee" to see him. Had heard the name several times before that. Admits what Smiths said under oath was correct concerning what was said and done at his office when they visited him. "Yes, there was talk there about them trying to get their money back that they had paid out." That Smalley came to the office; that he turned the matter over to Smalley. "Yes, Joe (Smalley) told me he would straighten it up with them." Admits he and Smiths had a long talk. "Yes, he gave him (Coy) those checks

and tried to pay him. Had two or three cussing matches with Beaman and almost had a fight with him once."

Defendant's first proposition is that the statute (§ 2474, O. S. 1931, 21 O. S. 1941 § 274) under which defendant is charged is a bribery statute and has no application to a private individual.

This contention of defendant's has been decided adversely to him in the companion case of Joe H. Smalley v. State, 75 Okla. Cr. 1, 127 P. 2d 869, decided on this date. We therein held that the statute under which defendant was prosecuted is separate and distinct from our statutes covering bribery of public officers. The violation of the bribery statutes is a felony. The statute under which defendant is prosecuted is punishable as a misdemeanor. The state makes no proof that any officer was bribed. Tom Waldrep as an individual is charged and the fact that he happened to be a Senator only added to the moral seriousness of his offense. He was properly prosecuted as an individual. The secret manner of handling the pay-offs and other activities of the conspirators shows that they considered their activities as wrongful.

Defendant's second proposition is that the conviction is not supported by sufficient evidence.

The state's case is based on the theory that Waldrep, Beaman, and Smalley conspired to violate section 2474, O. S. 1931, supra, by procuring for Coy Smith an appointment to a subordinate position in the Highway Department of Oklahoma, for gratuity or reward. Beaman, Smalley, and Waldrep recommended a group of people, all nonresidents of the state, for jobs, and in one instance, that of Mastin Thomason, defendant Waldrep wrote a letter promising to get him a job. Most of these people were put to work solely on the recommendation of Senator Waldrep. After the July primary most of them lost

their jobs. They then went to Waldrep for their money; some of them were paid and others were given "hot" checks. We think a conspiracy was established beyond a reasonable doubt.

"A 'conspiracy' may be defined, generally, as a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means." Wilson v. State, 5 Okla. Cr. 649, 115 P. 819, 823.

"In cases of crimes perpetrated by several persons, when once the conspiracy or combination is established, the act or declaration of one conspirator or accomplice in the prosecution of the enterprise, is considered the act or declaration of all, and therefore imputable to all. All are deemed to assent to, or command what is said or done by any one in furtherance of the common object." Wharton's Cr. Ev., 9th Ed., § 698.

Although the defendant remained in the background so far as the actual payment by the various job seekers from Arkansas to him personally was concerned, there is abundant circumstantial evidence which should convince any conscientious juror that the defendant was implicated with Beaman and Smalley in this nefarious scheme. The conduct of the defendant throughout all of the proceedings was not that of an ordinary, innocent person. When the two Smiths came to his office in Shawnee after their money he promised to fix things up; when Smalley arrived at defendant's office he and defendant went to a private office, out of the presence of the Smiths, and had a long conversation. Smalley then emerged from the office and said things would be fixed all right. At no time during that incident did the defendant seem indignant at Smalley for what he later alleged was the selling of his friendship. Defendant paid back graft money collected by Beaman and Smalley. He issued various bad

checks and drafts in an effort to appease the victims of this conspiracy. Defendant stated he was giving these checks in order to avoid a scandal and to assist the persons who had been victimized. In the judgment of this court the giving of checks which are turned down for payment because of insufficient funds is a poor method of assisting some one who needs money or to suppress scandal.

The witness Si Miller testified that early in August, 1937, he talked to defendant Waldrep in the Capitol building about getting a job over here and that he had paid $300 to get the job, and in his conversation with defendant asked if there was anything further for the witness to do and Waldrep stated "No," that he would look after the matter. Later he again approached defendant at the Capitol and asked about getting his job there and defendant said that if he was dissatisfied he would give him his money back, to which the witness replied that he had quit his job to take a state job and wanted to go ahead and get a state job and did not want his money back.

It is next argued that the court erred in admitting incompetent and irrelevant evidence. This assignment is directed to the testimony of Si Miller. The state offered this witness in chief. The court sustained an objection for the reason that Si Miller's name had not been endorsed on the indictment. The state then withdrew this witness, but later, after proper foundation had been laid in examination of defendant Waldrep, introduced the evidence of said witness on rebuttal. Defendant contends that this was error.

Had the name of Si Miller been endorsed on the indictment, there could have been no objection to his testimony. The substance of the testimony of this witness

has been set forth in connection with the discussion of the sufficiency of the evidence.

"It is discretionary with the trial court, in furtherance of justice, to permit evidence in rebuttal which would have been competent evidence in chief." Tingley v. State, 16 Okla. Cr. 639, 184 P. 599.

The trial court did not allow the witness Miller to testify generally concerning his transactions had with defendant and Joe Smalley. However, when defendant was on the witness stand and testifying on direct examination by his own counsel, he stated that Ernest Casto was the first person to whom he had talked who intimated that he had gotten a job where he (Waldrep) was supposed to have been paid for his help in getting it for him. His counsel further asked Waldrep whether anybody had ever talked to him about remunerating him for securing a job. These questions were sufficient to authorize the county attorney, on cross-examination, to question defendant about the Si Miller transaction and to lay a proper predicate for the introduction of the Miller testimony in rebuttal, under the limitations imposed by the court. We do not think there was any abuse of discretion in this case.

Defendant further contends that the court erred in failing to instruct the jury that the testimony of Si Miller could only be considered for the purpose of impeachment.

We think that the court's instructions as a whole completely covered the general law of this case. Furthermore, defendant did not present to the court any request in writing for an additional instruction. Also, no exceptions were taken to any of the instructions given by the court. It is not error for the court to fail to give a particular instruction, unless requested by the defendant

in writing, unless by the failure of the court to give an instruction defendant has been deprived of a substantial and fundamental right.

In Lumpkin v. State, 5 Okla. Cr. 488, 489, 115 P. 478, it is stated:

"Our statutes require a trial judge to instruct the jury as to all matters of law which he thinks are necessary for their information in giving their verdict. If counsel for a defendant are of the opinion that additional instructions should be given to the jury, it is their duty to reduce them to writing, submit them to the trial judge, and request that they be given to the jury. If they fail to do this, a conviction will not be reversed unless this court is of the opinion, in the light of the entire record and instructions of the court, that by the failure of the trial court to instruct the jury upon some material question of law the defendant has been deprived of a substantial right."

In Campbell v. State, 42 Okla. Cr. 156, 274 P. 1094, this court ruled:

"Where no objection is made or exception taken to the instructions given by the court, and no requests for instructions are made, error cannot be predicated upon the failure of the court to give any particular instruction."

The fourth proposition presented by defendant is that the trial court committed error in giving instruction No. 8.

The instruction in question reads as follows:

"Gentlemen, you are instructed that according to the testimony of L. V. Beaman, he was an accomplice of the defendant, Joe H. Smalley, and the defendant, Tom Waldrep. In this regard, the court instructs you that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as tends to connect the defendant with the commission of the offense charged; and the corroboration is not suffi-

cient if it merely shows the commission of the offense or the circumstances thereof."

The defendant contends that this instruction invaded the province of the jury and that the court assumed that witness L. V. Beaman was an accomplice. No exception was taken to the instruction as given nor was any instruction offered. This instruction was given for the benefit of the defendant, is favorable to him, and is such an instruction as we think should have been given. What was said in connection with the disposition of assignment of error No. 3 on the failure of defendant to request an additional instruction, or correct instruction, where he thinks the instruction given is inadequate, applies with equal force to this contention.

The fifth proposition advanced by defendant is that the court erred in its failure to instruct the jury as to the testimony of the accomplice witnesses, namely: Coy Smith, Chester Leonard, Shannon Leonard, T. J. Smith, Ernest Casto, Mastin Thomason, and Si Miller.

Here, also, counsel for defendant failed to request an instruction on this point, and, as hereinabove stated, did not object or except to any of the instructions which were given. If counsel for defendant desired a particular instruction on this matter he should have requested it.

Furthermore, since these witnesses could not have been indicted or informed against for the offense for which the defendant was tried, they would not be accomplices.

The sixth proposition urged by defendant is that the trial court committed error by its failure to instruct the jury as to evidence of collateral crimes.

The court instructed the jury as follows:

"You are further instructed that evidence has been introduced in this case concerning other crimes similar

to the one charged in this Indictment contended by the State to have been committed by this defendant. This evidence has been permitted to go to you for one purpose only, and that is to help you, if it does, determine the plan, scheme, motive, intent and guilty knowledge of the defendant in the case on trial. Your consideration of this character of testimony should be restricted to this purpose only."

No exception was taken to this instruction and no request for additional instruction was presented. This assignment is without merit.

Defendant has presented an able and extensive brief covering all of the assignments of error. We have carefully reviewed the record and do not find that there has been any prejudicial error committed. The statute under which this prosecution was instituted has never before been given a judicial interpretation. It may be true as has been suggested that others were doing the same thing as was being done by defendant. The fact that the accused persons did not think there was a statute forbidding such activities is no defense. As hereinbefore pointed out, the conspirators, by their own actions, have shown that they thought the things they were doing were wrongful. The pay-offs were always in toilets or other secluded places. All of the job seekers were admonished not to discuss what had happened or to tell where they resided. The persons who were approached to buy jobs were mostly nonresidents of the state and less likely to betray the conspirators. We have taken all these things into consideration in determining whether the punishment assessed the defendant is excessive.

We have come to the conclusion that the ends of justice will be met by reducing the sentence imposed against the defendant from one year in the county jail and a fine

of $1,000, to six months in the county jail and a fine of $1,000.

It is therefore ordered that the judgment of the court of common pleas of Oklahoma county is modified or reduced from one year in the county jail and a fine of $1,000, to six months in the county jail and a fine of $1,000, and the judgment and sentence as thus modified is affirmed.

DOYLE, J., concurs. BAREFOOT, P. J., disqualified and not participating.